NATIONAL ASSOCIATION OF GREET-
ING CARD PUBLISHERS, Appellant,

v.

The UNITED STATES POSTAL
SERVICE, Appellee,

United Parcel Service of America, Inc.,
et al., Intervenors.

NATIONAL ASSOCIATION OF GREET-
ING CARD PUBLISHERS, Petitioner,

v.

UNITED STATES POSTAL
SERVICE, Respondent,

United Parcel Service of America, Inc.,
et al., Intervenors.

ASSOCIATED THIRD CLASS MAIL
USERS and National Easter Seal Socie-
ty for Crippled Children and Adults

v.

UNITED STATES POSTAL
SERVICE, Appellant,

Postal Rate Commission et al.,
Intervenors.

STATE OF MAINE et al., Appellants,

v.

UNITED STATES POSTAL
SERVICE, Appellee.

Nos. 75–1856, 75–1857, 75–2227,
75–2228 and 75–2238.

United States Court of Appeals,
District of Columbia Circuit.

Argued Feb. 20, 1976.

Decided Dec. 28, 1976.

See 98 S.Ct. 253.

Matthew S. Perlman, Washington, D. C., with whom Douglas G. Green, Washington, D. C., was on the brief for appellant in No. 75–1856 and petitioner in No. 75–1857.

James R. Adams, Asst. Atty. Gen., Commonwealth of Massachusetts, Boston, Mass., with whom Francis X. Bellotti, Atty. Gen., Commonwealth of Massachusetts, Boston, Mass., was on the brief for appellants in No. 75–2238, also filed a brief as amici curiae in Nos. 75–1856 and 75–1857.

James H. Finch, Jr., Associate Gen. Counsel, U. S. Postal Service, and Ronald R. Glancz, Atty., Civ. Div., Appellate Section U. S. Dept. of Justice, Washington, D. C., with whom Rex E. Lee, Asst. Atty. Gen., Louis A. Cox, Gen. Counsel, U. S. Postal Service, Earl J. Silbert, U. S. Atty., and John L. DeWeerdt, Atty., U. S. Postal Service and Paul M. Tschirhart, Asst. U. S. Atty., Washington, D. C., were on the brief for appellee in Nos. 75–1856 and 75–2238 and respondent in No. 75–1857. Neil H. Koslowe, Atty., Civ. Div., Appellate Section,

Dept. of Justice, Washington, D. C., was on the brief for appellants in Nos. 75–2227 and 75–2228. Donald J. Engleman, Atty., U. S. Postal Service, and Thomas G. Wilson, Atty., Dept. of Justice, Washington, D. C., entered appearances for appellee in No. 75–1856 and respondent in No. 75–1857. Eugene R. Sullivan, Atty., Dept. of Justice, and Paul M. Tschirhart, Asst. U. S. Atty., Washington, D. C., also entered appearances for appellants in Nos. 75–2227 and 75–2228.

J. Edward Day, Washington, D. C., with whom William F. Taylor, Washington, D. C., was on the brief, for appellee, Associated Third Class Mail Users. William D. Kramer, Washington, D. C., also entered an appearance for appellee, Associated Third Class Mail Users. J. Edward Day, Washington, D. C., entered an appearance for Associated Third Class Mail Users in No. 75–1856.

Nicholas S. McConnell, with whom Kenneth Wells Parkinson, Washington, D. C., was on the brief, for appellee National Easter Seal Society for Crippled Children and Adults.

David M. Kendall, Jr., First Asst. Atty. Gen., State of Texas and William C. Bednar, Jr., Asst. Atty. Gen., State of Texas, Austin, Tex., were on the brief for appellant in No. 75–2238.

Bernard G. Segal, Robert L. Kendall, Jr., Philadelphia, Pa., and Frederick C. Belen, Washington, D. C., were on the brief for intervenor, United Parcel Service of America, Inc.

Robert A. Saltzstein and William L. Fallon, Washington, D. C., were on the brief for intervenor, American Business Press, Inc.

William G. Mullen, Washington, D. C., was on the brief for intervenor National Newspaper Association.

Richard M. Schmidt, Jr., and Ian D. Volner, Washington, D. C., entered appearances for intervenor, Association of American Publishers.

Daniel B. Jordan, Washington, D. C., filed a brief on behalf of American Postal Work-

ers as amicus curiae urging affirmance in Nos. 75–2227 and 75–2228.

David C. Todd, Washington, D. C., entered an appearance for intervenor Parcel Post Association.

Before BAZELON, Chief Judge, ROBINSON and MacKINNON, Circuit Judges.

Opinion PER CURIAM.

Concurring Opinion filed by Circuit Judge MacKINNON.

## TABLE OF CONTENTS

| | | Page |
|---|---|---|
| Introduction | | 575 |
| I. | Background | 575 |
| | A. Legislative requirements | 575 |
| | B. Prior ratemaking proceedings | 577 |
| II. | Nos. 75–1856, 75–1857: The NAGCP case | 577 |
| | A. 39 U.S.C. § 3601 | 578 |
| | B. 39 U.S.C. § 3622 | 580 |
| | 1. Commission's approach to section 3622 (b)(3) and ALJ's alternative approach | 581 |
| | a. Attribution | 581 |
| | b. Assignment | 582 |
| | c. Alternative approaches | 583 |
| | 2. Requirements of section 3622 | 584 |
| | a. Interpreting subsection 3622(b)(3) | 585 |
| | b. Compliance with the Act | 590 |
| | (1) Attribution | 590 |
| | (2) Assignment | 592 |
| III. | Nos. 75–2227, 75–2228 and No. 75–2238: The ATCMU and the State of Maine cases | 593 |
| | A. The ATCMU case | 594 |
| | 1. Proposed changes in fees for special services | 595 |
| | 2. Request for changes in postal rates and fees | 598 |
| | B. The State of Maine case | 602 |

PER CURIAM:

These three cases, consolidated for consideration on the merits, raise a full range of substantive and procedural challenges to a series of orders of the United States Postal Service ("Postal Service" or "USPS") issued pursuant to the Postal Reorganization Act of 1970 ("Act"), 39 U.S.C. § 101 et seq., for the purpose of implementing certain increases in postal rates and fees, either temporarily or on a permanent basis.[1] In Nos. 75–1856, 75–1857—the National Association of Greeting Card Publishers ("NAGCP") case—we review the permanent rates that were in effect from September to December, 1975. In Nos. 75–2227, 75–2228 and No. 75–2238—the Associated Third Class Mail Users ("ATCMU") and State of Maine cases, respectively—we review the temporary rates that were in effect from December, 1975 to July 18, 1976. Viewed together these cases prompt us not only to decide the individual merits of each claim but also to consider the Postal Service's overall progress to date in adapting to the Act's special, and quite demanding, ratemaking requirements. We bring to this task our prior experience in interpreting the complex procedures by which postal rates and fees are set under the Act.[2]

## I. BACKGROUND

While each case before us offers its own unique theory for invalidating the rates or fees it challenges, all three cases require an understanding of the ratemaking procedure prescribed in the Act.

### A. Legislative Requirements

Briefly put the Act created the Postal Service, "an independent establishment of the executive branch of the Government of the United States,"[3] which is directed by

---

1. See 39 U.S.C. §§ 3621–25, 3641.

2. See Direct Mail Marketing Association, Inc. v. United States Postal Service, 163 U.S.App. D.C. 157, 501 F.2d 717 (1974); Association of American Publishers, Inc. v. Governors of United States Postal Service, 157 U.S.App.D.C. 397, 485 F.2d 768 (1973); Direct Mail Advertising Ass'n v. United States Postal Service, 147 U.S. App.D.C. 394, 458 F.2d 813 (1972); see also Mail Advertising Corp. of America v. United States Postal Service, 148 U.S.App.D.C. 158, 459 F.2d 1182 (1972).

3. 39 U.S.C. § 201.

an eleven member Board of Governors ("Board") composed as follows: nine presidentially appointed "Governors"; the Postmaster General, who is the "chief executive officer of the Postal Service"[4] and is appointed by the Governors; and the Deputy Postmaster General, who is appointed by the Governors and the Postmaster General.[5] Some powers are conferred on the Governors as distinct from the Board.[6] The Act also created the independent, five member Postal Rate Commission ("Commission") which is charged with submitting to the Governors, upon request, "recommended decision[s] on changes in a rate or rates of postage or in a fee or fees for postal services."[7]

The ratemaking procedure prescribed by the Act may be summarized as follows. The Postal Service submits to the Commission a formal request for new rates or fees, which request may be accompanied by suggestions for rate adjustments which the Postal Service deems suitable.[8] The Commission must provide an opportunity for a hearing on the record and, at the conclusion of this proceeding, must transmit its recommended decision to the Governors.[9] The Governors then may approve the decision and order it into effect, or allow it to take effect under protest while seeking judicial review or Commission reconsideration, or reject it and have the Postal Service resubmit the request for reconsideration and a further recommended decision in which event the further recommended decision may, under limited circumstances, be modified by the Governors and put into effect as modified.[10] An aggrieved party who ap-

peared in the Commission proceedings may appeal the "decision of the Governors to approve, allow under protest, or modify the recommended decision," and the reviewing court "may affirm the decision or order that the entire matter be returned for further consideration, but the court may not modify the decision."[11]

To avoid any prolonged disruption to the Postal Service's financial integrity which compliance with this elaborate procedure might cause, the Act also provides for the implementation of temporary increases in rates or fees. If the Commission "does not transmit to the Governors within 90 days after the Postal Service has submitted, or within 30 days after the Postal Service has resubmitted, to the Commission a request for a recommended decision . . . the Postal Service, upon 10 days' notice in the Federal Register, may place into effect temporary changes in rates of postage [or] in fees for postal service."[12] A temporary rate or fee, however,

> may not exceed the lesser of (1) the rate or fee requested for such class or service, or (2) a rate or fee which is more than one-third greater than the permanent rate or fee in effect for that class or service at the time a permanent change in the rate or fee of such class or service is requested under section 3622 of this title.[13]

In addition, if upon judicial review of a decision of the Governors on permanent rates, taken pursuant to 39 U.S.C. § 3628, the court "orders a matter returned to the Commission for further consideration, the

---

**4.** 39 U.S.C. § 203.

**5.** 39 U.S.C. § 202.

**6.** 39 U.S.C. § 102. For instance, the power to submit to the Commission a request for a recommended decision on changes in postal rates and fees is entrusted to the Postal Service and hence, under the terms of the Act, to the Board as the body which directs the exercise of power of the Postal Service, *see* 39 U.S.C. §§ 3622, 202(a), while the power to act upon recommended decisions submitted by the Commission is entrusted to the Governors, *see* 39 U.S.C. §§ 3625, 3624.

**7.** 39 U.S.C. §§ 3601–04, 3622–24.

**8.** 39 U.S.C. § 3622.

**9.** 39 U.S.C. § 3624. An officer of the Commission shall be appointed "to represent the interests of the general public" at the hearing. *Id.*

**10.** 39 U.S.C. § 3625.

**11.** 39 U.S.C. § 3628.

**12.** 39 U.S.C. § 3641(a).

**13.** 39 U.S.C. § 3641(c).

Postal Service, with the consent of the Commission, may place into effect temporary [rates or fees]."[14] Finally, judicial review of temporary rates or fees may be sought in the district court.[15]

### B. *Prior Ratemaking Proceedings*

To date three ratemaking proceedings have been initiated under the Act. The first proceeding (docket no. R71–1), which may be identified by its establishment of permanent 8 cent first class rates, began when the Postal Service submitted a request on February 1, 1971. Temporary rates were put into effect May 16, 1971, and on June 29, 1972, the Governors approved the Commission's recommended decision and ordered permanent rates put into effect. On appeal pursuant to 39 U.S.C. § 3628 this Court affirmed the Governor's order. *Association of American Publishers, Inc. v. Governors of the United States Postal Service,* 157 U.S.App.D.C. 397, 485 F.2d 768 (1973) [hereafter cited as *American Publishers*].

The second proceeding (docket no. R74–1) established 10 cent first class rates. It was initiated with a request on September 25, 1973; temporary rates were put into effect March 2, 1974; and permanent rates were ordered September 4, 1975, after nearly two years of Commission proceedings. The NAGCP case seeks judicial review of this order pursuant to 39 U.S.C. § 3628.

The latest proceeding (docket no. R76–1), which may be identified by its proposal to establish permanent 13 cent first class rates, began with a request that was submitted September 18, 1975, and was resubmitted December 19, 1975.[16] The ATCMU and State of Maine cases were brought in district court to enjoin implementation of temporary rates based on this request. Following district court orders in which injunctive relief was granted on procedural grounds (ATCMU), but denied on substantive grounds (State of Maine), appeals were taken to this Court. We stayed the district court injunction, and on December 31, 1975, temporary 13 cent first class rates were put into effect.

### II. Nos. 75–1856, 75–1857: THE NAGCP CASE

The first case involves the second ratemaking proceeding conducted under the Act and is before us on NAGCP's petition to review the September 4, 1975 order of the Governors which approved the Commission's recommended decision and ordered into effect the permanent rates there recommended.

In that proceeding the Commission, after receiving the Postal Service's September 25, 1973 request for a recommended decision, assigned Chief Administrative Law Judge ("ALJ" or "Judge") Seymour Wenner, who had presided at the first ratemaking proceeding,[17] to preside at the hearing.[18] Tak-

---

**14.** 39 U.S.C. § 3641(b).

**15.** Since "[s]ection 3628 which limits the jurisdiction of the courts, deals only with decisions of the Commission or the Governors; not with the Board of Governors—which exercises the power of the Postal Service to set temporary rates." *Mail Advertising Corp. of America v. United States Postal Service,* 148 U.S.App.D.C. 158, 159, 459 F.2d 1182, 1183 (1972), temporary rates are reviewed in the district court rather than the Court of Appeals.

**16.** At the same time the Postal Service sought also to implement permanent changes in fees for certain services. However, rather than including these proposed changes in its request for changes in postage rates, the Service sought to implement the fee increases simply by notice in the Federal Register with opportunity provided for comment by interested par-

ties. Whether changes in such fees are subject to Commission jurisdiction and hence to the procedures of request, Commission hearing, recommended decision and Governors' order is a major issue in the ATCMU case and is discussed there.

**17.** *See American Publishers,* 157 U.S.App.D.C. at 408 n.18, 485 F.2d at 779 n.18 (Bazelon, C. J., concurring).

**18.** 1—478. In accordance with 39 U.S.C. § 3625(e) the record of the proceedings has been printed. It is organized into four main volumes. References to the record will be indicated by citation to the appropriate volume and page number in the following manner: —— ——.

ing part in the hearing, which began June 27, 1974, were some 29 full participants and 17 limited participants.[19] Extensive evidence was taken over some 46 days of hearings, the record being closed on December 20, 1974.[20]

■ After briefing, issuance of the ALJ's initial decision (May 28, 1975), and two days of oral argument before the Commission, the case was submitted to the Commission, which transmitted its recommended decision to the Governors on August 28, 1975.

The Governors' implementing order and this appeal followed.[21]

## A. 39 U.S.C. § 3601

At the outset we are met with the contention that the Commission, at the time it considered and composed its recommended decision, was improperly constituted under the Act and that therefore the actions it took, regardless of their validity otherwise, are without force and effect.

Section 3601 of the Act establishes the Commission and mandates that it be "com-

19. 1—478. Among the participants were United Parcel Service of America, Inc., American Business Press, Inc., and National Newspaper Association, all three of which intervened in this appeal and filed briefs. Also participating in this appeal, as amicus curiae, is State of Maine, et al., appellant in No. 75–2238.

20. "Ten witnesses appeared on behalf of the Postal Service, six for the [officer of the Commission], thirty-eight for other parties and two were called by the Judge." 1—479.

21. As in *American Publishers* our jurisdiction is invoked pursuant to 39 U.S.C. § 3628, which provides us with exclusive jurisdiction, mandates that we make this matter a preferred cause on our calendar, and prohibits us from suspending the permanent rates pending decision.

On September 4, 1975, the same day the Governors issued the order implementing the permanent 10 cent rates contested in NAGCP, the Board directed that a new request seeking further increases be submitted to the Commission. That directive resulted in the commencement of Commission proceedings on permanent 13 cent rates (docket no. R76–1). It also resulted, on December 31, 1975, in the implementation of the temporary 13 cent rates that are contested in ATCMU and State of Maine. See pp. ———— of 186 U.S.App.D.C., p. 593 of 569 F.2d *infra*. All three cases were argued February 20, 1976. On June 30, 1976, the Commission transmitted to the Governors its recommended decision in docket no. R76–1, recommending implementation of permanent 13 cent rates; on July 7 the Governors approved the recommended decision; and on July 18 the permanent 13 cent rates became effective pursuant to the Governors' July 7 order. See 41 Fed.Reg. 29570 (July 16, 1976). The July 7 order is being challenged in this Court in *National Association of Greeting Card Publishers v. United Postal Service*, No. 76–1611.

No party to this appeal directed the Court's attention to the potentially significant events which occurred subsequent to oral argument.

To say the least this failure, especially on the part of the Postal Service, is difficult to explain and hard to excuse. Since we may take judicial notice of such events and of the record in the related case, however, the implications of the Postal Service's subsequent action need not escape our review.

Although implementation of the new permanent rates may preclude this Court from presently providing an effective remedy for any injury incurred as the result of the prior, allegedly unlawful permanent rates, see 39 U.S.C. §§ 3628, 3681, the appeal need not be dismissed as moot. Petitioner has a continuing interest in the establishment of postal rates that comply with the Act, and it appears from the record in No. 76–1611 that the new permanent rates are based on a methodology significantly similar to that which petitioner here challenges as violative of the Act. See pp. ——— of 186 U.S.App.D.C., pp. 602–603 of 569 F.2d *infra*. In short, it appears that the same controversy between the same parties has arisen anew. Moreover, less than eleven months elapsed between the order implementing permanent 10 cent rates, which prompted the instant petition to review, and the implementation of the permanent 13 cent rates, which is the basis of a suggestion of mootness, and there is nothing to indicate that this cycle will not be repeated to the possible frustration of future petitions to review. Indeed, representations of the Postal Service as to its present financial difficulties and the streamlining of Commission proceedings may suggest that the current permanent rates will be even shorter lived than their predecessors. In sum, the instant controversy falls squarely within the "capable of repetition, yet evading review" exception to mootness and therefore satisfies the case or controversy prerequisite to federal jurisdiction. *Roe v. Wade*, 410 U.S. 113, 124–25, 93 S.Ct. 705, 713, 35 L.Ed.2d 147 (1973) (nine month human gestation period too short for completion of usual appellate process); see also note 107 *infra* and cases cited therein.

posed of 5 Commissioners appointed by the President, not more than 3 of whom may be adherents of the same political party." At the time in question three of the Commissioners were members of the Republican Party while one was a member of the Conservative Party of New York State. The claim of improper composition rests in essence on the assertion that these two political parties are "the same political party" within the meaning of section 3601.

■ No claim is made that the organization of either party is a sham[22] or that one party exercises control over the other.[23] Rather, the heart of the argument is an assertion of sameness predicated on an evaluation of certain similarities in the political philosophies of the two parties. Believing it well outside our proper judicial role to undertake such an analysis, we exercise no jurisdiction and express no views whatsoever on the issue. *See Baker v. Carr*, 369 U.S. 186, 217, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962); *Coleman v. Miller*, 307 U.S. 433, 453–54, 59 S.Ct. 972, 83 L.Ed. 1385 (1939).

■ Furthermore, even were we to assume that the Commission was improperly composed, there is a separate and independent reason why the actions here challenged would still be valid. At least since *Ex parte Ward*, 173 U.S. 452, 19 S.Ct. 459, 43 L.Ed. 765 (1899), the law has been clear that:

> A person actually performing the duties of an office under color of title is an officer de facto, and his acts as such officer are valid so far as the public or third parties who have an interest in them are concerned.

*United States ex rel. Doss v. Lindsley*, 148 F.2d 22, 23 (7th Cir. 1945), *cert. denied*, 324 U.S. 863, 65 S.Ct. 866, 89 L.Ed. 1419 (1945); *see United States v. Krueger*, 319 F.Supp. 225, 226–27 (N.D.Ill.1970). In short, the remedy for improper composition is not invalidation of the Commission's action through indirect challenge, but rather removal of the allegedly disqualified Commissioner by way of direct attack.[24] *See, e. g., Ryan v. Hershey*, 445 F.2d 560 (8th Cir. 1971), *cert. denied*, 404 U.S. 1004, 92 S.Ct. 565, 30 L.Ed.2d 557 (1971); *United States v. Chaudron*, 425 F.2d 605 (8th Cir. 1970), *cert. denied*, 400 U.S. 852, 91 S.Ct. 93, 27 L.Ed.2d 89 (1970); *United States v. Brooks*, 415 F.2d 502 (6th Cir. 1969), *cert. denied*, 397 U.S. 969, 90 S.Ct. 1003, 25 L.Ed.2d 263 (1969).[25]

---

**22.** For obvious reasons the argument is directed at the Conservative Party of New York and Commissioner O'Doherty rather than the Republican Party and its three Commissioners. However, we have already recognized the validity of the Conservative Party. *See Buckley v. Valeo*, 171 U.S.App.D.C. 172, 217 & nn.115, 118, 519 F.2d 821, 865–67 & nn.115, 118 (1975) *aff'd in part and rev'd in part,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), *modified,* 174 U.S.App.D.C. 300, 532 F.2d 187 (1976). See also *Cooke v. Lomenzo,* 31 N.Y.2d 244, 336 N.Y.S.2d 457, 288 N.E.2d 291 (1972); *Pichler v. Jennings,* 347 F.Supp. 1061 (S.D.N.Y.1972). And Commissioner O'Doherty's allegiance to the Conservative Party can hardly be doubted in view of the fact that at the time in question he was not only a registered voter but also a state official of the Party. *See also Application of Leichter,* 32 Misc.2d 234, 223 N.Y.S.2d 789 (1961) (member of political party is bound by party rules).

**23.** *See* note 22 *supra.* For example, in 1970 James Buckley won election to the Senate as a member of the Conservative Party by defeating a Republican Party opponent. *The World Almanac and Book of Facts 1971,* at 37 (L. Long ed.); *Congressional Quarterly's Guide to U. S.*

*Elections* 500 (R. Diamond ed.). *See also Buckley v. Valeo,* 171 U.S.App.D.C. 172, 217 & n.118, 519 F.2d 821, 867 & n.118 (1975) *aff'd in part and rev'd in part,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), *modified,* 174 U.S.App. D.C. 300, 532 F.2d 187 (1976).

**24.** 39 U.S.C. § 3601; 5 U.S.C. § 7521. In addition, *quo warranto* might also be available as a direct attack device. *But see Newman v. United States ex rel. Frizzel,* 238 U.S. 537, 35 S.Ct. 881, 59 L.Ed. 1446 (1915); *Blackburn v. O'Brien,* 289 F.Supp. 289, 292–93 (W.D.Va. 1968); *see also United States v. Machado,* 306 F.Supp. 995, 1000–02 (N.D.Cal.1969).

**25.** *United States v. Williams,* 317 F.Supp. 1363 (E.D.Pa.1970), does not require an opposite conclusion. That case, and the case upon which for this point it relies exclusively, *United States v. Machado,* 306 F.Supp. 995 (N.D.Cal. 1969); *see also United States v. Lemke,* 310 F.Supp. 1298 (N.D.Cal.1969), *set aside* 439 F.2d 762 (9th Cir. 1969); *United States v. Beltran,* 306 F.Supp. 385 (N.D.Cal.1969), represent a line of authority inapposite to the instant case. *Williams* and *Machado* hold that a defendant being prosecuted criminally for failure to report

## B. *39 U.S.C. § 3622*

On the merits the case focuses on 39 U.S.C. § 3622, the section of the Act which sets forth the cost and noncost considerations that the Commission must take into account in setting rates. The "most concrete"[26] of these, and only one of the subsections which deals expressly and exclusively with cost factors,[27] is subsection 3622(b)(3) which establishes

> the *requirement* that each class of mail or type of mail service bear the direct and indirect postal costs attributable to that class or type plus that portion of all other costs of the Postal Service reasonably assignable to such class or type.[28]

In response to section 3622 the Commission developed for this proceeding, and the Governors adopted by their order, a two-step process for allocating among the classes of mail all the costs of operation. While each step will be described more fully below,[29] the Commission's approach may be summarized at the outset as follows. The Commission sought as its first step to identify and allocate to each class of mail those costs which in its view indisputably were the result of providing that particular service. A rate floor for each class of mail, *see* note 58 and accompanying text *infra*, was thus established by "attributing"[30] a portion of the total costs on the basis of "cost variability"—an approach which evaluates

---

for and submit to induction may raise as a defense the allegation that the local draft board was not duly constituted and that therefore the prosecution is unable to establish an essential element of its case, *i. e.* that the draft board complied with all applicable selective service regulations. The district courts in both cases entered judgments of acquittal.

We need not decide whether *Williams, Machado*, and cases following them represent the correct view on this issue. *Compare United States v. Nussbaum*, 306 F.Supp. 66 (N.D.Cal. 1969), and cases cited in text at this footnote; *see also United States v. Reeb*, 433 F.2d 381 (9th Cir. 1970), *cert. denied*, 402 U.S. 912, 91 S.Ct. 1391, 28 L.Ed.2d 654 (1970) (affirming conviction despite the assumed fact that board members had not met the residency requirements, even assuming these requirements were mandatory rather than directory). All these cases involve the question whether the issue of an agency member's qualifications may be raised as a defense to a criminal prosecution for violation of an order of that agency. They do not, as in the instant case, ask whether the issue may be raised by way of an affirmative collateral attack upon the validity of the order as part of a civil suit directly challenging the substance of the order. The interest which justifies the general rule, *i. e.* avoiding "the uncertainty that would otherwise cloud . . . official public acts," *Nussbaum, supra*, 306 F.Supp. at 68, may be outweighed where criminal conviction could result from strict adherence to the rule and where raising the issue in the criminal proceeding may be the only practicable avenue open to the defendant at that time. *See McKart v. United States*, 395 U.S. 185, 89 S.Ct. 1657, 23 L.Ed.2d 194 (1969); *Yakus v. United States*, 321 U.S. 414, 64 S.Ct. 660, 88 L.Ed. 834 (1944). The cases which have carved out the exception rely on just such a balancing. *See, e. g., Williams, supra*, 317

F.Supp. at 1367, 1370. In the instant case, however, no such countervailing interest exists.

**26.** *American Publishers*, 157 U.S.App.D.C. at 406, 485 F.2d at 777 (Bazelon, C. J., concurring).

**27.** See pp. ———–—— of 186 U.S.App.D.C., pp. 588–590 of 569 F.2d *infra*.

**28.** 39 U.S.C. § 3622(b)(3) (emphasis added).

**29.** The Commission's "attribution" method is described *infra* at pp. ———–—— of 186 U.S. App.D.C., pp. 581–582 of 569 F.2d. Its method for "assignment" of unattributed costs is discussed *infra* at pp. ———–—— of 186 U.S.App.D.C., pp. 582–583 of 569 F.2d.

**30.** As will become apparent below, the parties have attached differing meanings to the term "attributable" as used in subsection 3622(b)(3). The Commission equates attributable costs with marginal costs as that concept is defined in strict economics theory—a concept which imports notions of cost variability. Other parties, while not disputing that attribution connotes a cause and effect relationship, note that courts not infrequently construe the term in a less exacting manner than reliance on strict economics theory would permit. These parties offer varying definitions under which attribution would be accomplished by inferences of causation based on factors other than cost variability.

This debate is central to the case and is resolved below. However, to simplify discussion of this issue, we will use the term "attributable" throughout this opinion, unless otherwise indicated, in its nontechnical sense as implying no more than the existence of a cause and effect relationship, however that may be evidenced.

changes in costs as a function of changes in output volume. As its second step, in order to take into account the noncost factors of section 3622, the Commission then judgmentally "assigned" all the remaining costs on the basis of demand factors designed to determine "what the traffic will bear" in each class of mail.[31] Under this "inverse elasticity rule" approach, final rates evolved by assigning all the unattributed costs to the various classes of mail in inverse proportion to the relative elasticity of demand for each class; i. e., those classes of mail in which increases in rates hypothetically would cause lesser decreases in patronage were made to shoulder larger portions of the unattributed costs, while those with greater elasticity of demand were burdened with smaller markups above their attributed costs. Petitioner advances separate arguments to dispute each element of the Commission's approach.

*1. Commission's Approach to Subsection 3622(b)(3) and ALJ's Alternative Approach.*

*a. Attribution.* The premise of the Commission's approach to attribution is its belief that cost variability is the only proper indicator of causation. As the Commission explains,

> if a particular cost varies with a change in volume units, we infer that the cost is caused by such change and can be attributed to the class or service experiencing the change.

From volume variability, therefore, we can infer, and thereby establish, the causation that we seek. And by establishing minimum rates based on variable costs, we assure ourselves, the public, and Congress that no class has cross-subsidized any other class.[32]

The basic principles of this cost-of-service approach have remained unchanged since the Commission first adopted cost variability as its attribution methodology in the initial rate proceeding.[33]

The touchstone of the cost variability approach is the Commission's concern that causation be measured as accurately as possible—that within the bounds of available data, all elements of approximation or estimation be excluded.

> [W]e believe that causation is both the statutory and the logical basis for attribution. Where an analysis based on causation cannot be made because data are lacking, we will do better to acknowledge that fact and press for a better data base than to construct an "attribution" on a basis not contemplated by the statute.[34]

The stricture of this approach and the unavailability of complete data led in the first two rate proceedings to recommended decisions which, by the Commission's own account, did not attribute to each class all the costs that likely were the result of providing the particular service.[35] In the

---

**31.** *See Payne v. Washington Metropolitan Transit Comm'n,* 134 U.S.App.D.C. 321, 336, 415 F.2d 901, 916 (1968).

**32.** 1—589 (footnote omitted). The Commission also attributed in this proceeding certain "specific fixed costs," i. e., those costs which in the Commission's view can be identified with a single class of service without regard to volume. *See* 1—577. As defined by the Commission, however, these costs are almost insignificant, comprising approximately one percent of total costs. *Id.*

**33.** To be sure there have been modifications of the formula. For instance, in the first proceeding attributable costs were strictly confined to those costs which vary in direct proportion to the number of pieces of mail from year to year, whereas in the proceeding here under review the Commission adopted a reasonable "planning cycle" period rather than the strict one

year time span, *see* 1—482, and indicated a movement away from the confines of direct proportionality. But as Judge Wenner concluded, "in filing its proposal in [the second proceeding]. . . . Postal Service adopted substantially the same methods and principles it had used in the first proceeding." 1—2.

**34.** 1—587-88.

**35.** The Commission noted, for instance, that "[w]here the record is incomplete or inadequate for [volume variability] analysis, we have not attempted to carry the attribution process farther than our data permit. Instead, we have assigned the relevant costs according to the noncost standards of the statute." 1—483. And it went on specifically to state its view that "more costs can and will be attributed in future cases." 1—484.

first proceeding attributable costs were set at 49% of total costs. In the proceeding here under review the Commission, after revising upward the Service's proposal to attribute only 45.1% of costs, recommended that 52.5% of all costs be attributed.[36]

*b. Assignment.* The Commission used demand theory to assign all the remaining, unattributed costs (47.5%). An understanding of the Commission's approach requires an initial familiarity with the concept of demand elasticity. Simply put, the demand for a product is said to be elastic if lowering its price by a specific percentage leads to a greater percentage increase in the volume sold, or if raising its price by a specific percentage leads to a greater percentage reduction in its volume.[37]

Elasticity of demand forms the cornerstone of a demand theory (or "value-of-service") approach to apportioning costs. Such an approach seeks to minimize the impact that an increase in rate will have on services with positive demand elasticities by "impos[ing] on the services in relatively inelastic demand . . . higher surcharges, over and above marginal costs, than would be imposed by *any* rule of apportionment based exclusively on cost relationships."[38]

The Commission has developed, and used in both the first and second rate proceedings, a specific formulation of demand theory—what it calls the "inverse elasticity rule"—as a guide in assigning unattributed costs. Under this rule final rates are derived by assigning to the various classes of mail different markups (above attributed costs) in inverse proportion to the relative elasticity of demand for each of the classes. It is the Commission's position that generally by using demand factors, and specifically by testing its recommended rates against the inverse elasticity rule, it "can assign costs in a manner that fully takes into account the noncost factors of the statute."[39]

The Commission acknowledges that all classes of mail are basically insensitive to price increases, and that demand in each class, at least at present and reasonably foreseeable rates, is technically inelastic—that is, a rate increase in any class of mail will necessarily generate an increase in revenue albeit at reduced volume.[40] Generally demand theory is used to minimize the impact that a rate increase otherwise would have on products that are demand elastic. The Commission posits, however, that despite the high degree of inelasticity that presently prevails among all classes of mail, demand theory is nonetheless proper in postal ratemaking since it may be based on *relative* demand elasticities (or, more accurately, relative *in*elasticities). Accordingly, in the instant proceeding the Commission purported to develop a ranking of relative price sensitivity among the classes of mail and, based on this ranking, sought to establish the "optimum rate for each mail class and service," which it defined as "that rate which maximizes the volume of mail while recovering all the related attributable costs and making some contribution to the fixed

---

**36.** Despite the percentage increase in attribution between the first and second proceedings, the amount of remaining costs subject to the Commission's judgmental assignment *rose* by some $1.5 billion as a result of an increase in total costs from $9.84 billion to $12.04 billion.

**37.** 1—16. The coefficient of elasticity is computed mathematically by dividing a percentage change in volume by the associated percentage change in price. If the resulting number is between −1.0 and 0, *i. e.*, a coefficient of elasticity of less than unity, demand is said to be inelastic; *e. g.*, where a 10% price increase results in only a 5% or 3% volume decrease the coefficient of elasticity is −0.5 and −0.3 respectively. If, on the other hand, the resulting number is of a magnitude greater than −1.0

*i. e.* a coefficient of elasticity of greater than unity, demand is said to be elastic; *e. g.* where a 10% price increase results in a 20% or 30% volume decrease the coefficient of elasticity is −2.0 and −3.0 respectively. Coefficients of elasticity almost always bear negative signs because increased prices almost always produce decreased volumes, and vice versa, and therefore the numerator and denominator of the fraction will generally have opposite signs.

**38.** *J. Bonbright, Principles of Public Utility Rates*, 378 (1961) (emphasis in original).

**39.** 1—627; *see* 1—660–66.

**40.** 1—640.

overhead, so that in the end total costs are recovered."[41]

*c. Alternative approaches.* In recommending its attribution/assignment methodology to the Governors, the Commission rejected entirely the initial decision proposed by Administrative Law Judge Wenner and instead stood by the approach it first developed in the inaugural rate proceeding. In that proceeding ALJ (then Chief Examiner) Wenner severely criticized both the Commission's use of cost variability as its approach to attribution[42] as well as the Commission's reliance on the inverse elasticity rule as a guideline for assigning all the remaining costs.[43] However, constrained in that proceeding by the minimal cost data presented, the unavailability of alternative methodologies, and the "presumptions that surround an initial effort to formulate rates," the ALJ as well as this Court left undisturbed the Commission's initial use of cost variability and demand theory.[44]

When presented in the instant proceeding with the same approach, essentially unchanged, ALJ Wenner determined that the presumptions noted earlier no longer prevented full review.[45] Adopting and refining alternative methodologies advanced by various parties to the proceeding,[46] and using only the data provided in the Service's own submission, the ALJ proposed to the Commission an entirely different approach to attribution/assignment under which the ALJ attributed some 70.6% of costs and assigned the remaining costs primarily in accordance with cost-of-service rather than value-of-service principles.

The ALJ's attribution method proceeds from a premise quite at odds with that of the Commission. Whereas the linchpin of the cost variability approach is an abiding concern for the greatest possible accuracy in measuring causation, the ALJ's alternative approach devalues somewhat the interest in utmost accuracy in order to pursue more fully the goal of maximized attribution.[47] Simply put, the alternative approach relies on cost accounting principles to augment the inferences of causation derived through use of the cost variability theory. Additional attribution results from using distribution keys such as weight, volume and number of pieces of mail to apportion among the postal services affected those cost segments which clearly affect more than one service and which, although not measurably variable on presently available data, are reasonably susceptible to such apportionment. The approach is perhaps best understood by using transportation costs as an illustration of the method as applied.[48]

The transportation segment as constructed by the ALJ includes all the costs the Postal Service incurs, both for purchased and self-furnished services, to carry mail

41. 1—625.

42. *See American Publishers*, 157 U.S.App.D.C. at 405–06 & nn. 1, 6, 485 F.2d at 776–77 & nn. 1, 6.

43. *See id.* at 407, 485 F.2d at 778.

44. *Id.* at 407, 408, 485 F.2d at 778, 779; *see also* 1—867.

45. "Postal Service's presentation in this proceeding makes it clear that the first and primary task of the Postal Rate Commission is to remedy the Service's deficient determination and attribution of costs. . . . The task is no longer to criticize and exhort; it is to do the job—now." 1—4.

46. Judge Wenner noted that in the first proceeding the Commission "was constrained to accept Postal Service's attributable costs because no party had presented alternative costs and because the record did not provide a reliable basis for doing so," whereas in this proceeding several parties, including NAGCP, presented full cost data and alternative methodologies. 1—4.

47. As Judge Wenner put it
 [T]he difference[] between CALJ costing and USPS costing is not merely a difference in small adjustments about whether this or that cost is related to this or that class of mail. The difference is that CALJ costing practices pursue a different aim, with improvements in light of criticisms in the record, the aim of tracing all cost consequences of providing a particular class of mail. Postal Service never attempted such an attribution. . . .
 1—20, n. 1.

48. *See generally* 1—5–6.

from the patron's collection point to the receiving point, including, in addition to salaries, the costs associated with the servicing, maintenance and depreciation of vehicles. It does not include, however, the actual delivery function, *i. e.*, handing the mail to the patron or putting it in the patron's box, which comprises a different cost segment. In the instant proceeding total transportation costs were $2.621 billion, of which the Postal Service attributed only $545 million (21%), characterizing the remaining $2.076 billion as fixed costs subject to judgmental distribution. The ALJ, however, by analyzing the transportation function as being governed by considerations of the weight and cubic volume of the mail handled (as contrasted with the actual delivery function which is more a factor of the number of pieces of mail [49]) was able to attribute $2.565 billion (98%), leaving only $56 million subject to discretionary assignment. His reasoning was straightforward:

The cubic volume of mail determines the number and size of the vehicles required which affects the maintenance, fuel and lease costs. The weight of the mail affects the loading and unloading effort and also bears on the needed carrying strength and operational expenses of the vehicle. The cost of drivers varies with vehicle operations.

The cost of the mail carrier's walking (or driving a vehicle) over his route is governed by weight and space. What he can carry in his pouch and his hands is affected by the weight (35 pounds maximum under Postal Regulations) and the size (in cubic volume) of the load; this determines how often he must return to the relay box or to his car. The weight and cubic volume of mail also affects the size of the vehicle he needs (where he has one).[50]

49. *See* 1—5.

50. 1—5 (footnote omitted).

51. 1—660–66.

52. 1—20. One factor of which Judge Wenner understandably made particular note was the impact upon mail users that might result if in switching from past, oftentimes artificial rates

The ALJ's method for assigning the remaining costs is also quite opposed to principles underlying the Commission's adopted approach; it proposes complete rejection of the inverse elasticity rule.[51] Under the alternative approach each class of mail bears that portion of unattributed costs equal to its proportionate share of attributed costs unless individual and specific consideration of the noncost factors contained in section 3622(b) requires deviation from the standard markup.[52]

2. *Requirements of Section 3622.* Relying in large measure on the criticism leveled in the ALJ's initial decision, petitioner argues that the Commission's attribution assignment approach is violative of the Act in several respects. Initially petitioner asserts that the Commission's cost variability method is a too restrictive approach for attribution which permits the expense incident to one service to be thrown upon the customers using another service, resulting in unlawful cross-subsidization. *See, e. g., Northern Pacific Railway Co. v. North Dakota*, 236 U.S. 585, 597–98, 35 S.Ct. 429, 59 L.Ed. 735 (1915). Petitioner also attacks the Commission's reliance on demand theory, and in particular its use of the "inverse elasticity rule," as a means for assigning all unattributed cost, arguing that this approach preserves historical rate differentials and otherwise unduly and unreasonably discriminates against first class mail. *See* 39 U.S.C. § 403(c).

The foundation of both arguments is the assertion that the Act imposes a special obligation that allocation in accordance with cost-of-service principles be carried out as far as reasonably possible. In *American Publishers* we found "a strong indication" that Congress intended to impose just such a special obligation.[53] In that case, how-

to the present, more representative rates the standard markup would impose too drastic an increase. *See* 39 U.S.C. § 3622(b)(4); 1—20.

53. 157 U.S.App.D.C. at 408, 485 F.2d at 779. In that case we were confronted with a methodology not significantly different from that presently before us. We observed there that the Commission's initial response to the concrete

ever, in view of "the presumptions that surround an initial effort to formulate rates" we found it unnecessary to go beyond a mere preliminary assessment of the import of subsection 3622(b)(3).[54]

In this case, now that the Commission has had some five years of experience with the Act, the formidable task of definitively interpreting subsection 3622(b)(3) may no longer be deferred. We must first determine whether a thorough examination of the statute bears out our earlier assessment —whether, in short, the Act requires that special efforts be made to trace all the cost consequences of providing the various services and to allocate costs on this basis to the fullest extent reasonably possible. Only then may we evaluate the Commission's approach for compliance with the Act.

*a. Interpreting subsection 3622(b)(3).* We begin with the words of the statute. As noted above, subsection 3622(b)(3) requires that "each class of mail or type of mail service bear the direct and indirect postal costs attributable to that class or type plus that portion of all other costs of the Postal Service reasonably assignable to such class or type." [55]

Three important points are immediately apparent. First, unlike any of the other ratesetting factors contained in section 3622(b), subsection (b)(3) is set forth as a "requirement",[56] a fact which suggests its special role in the Act's ratesetting scheme. Second, the section uses words which further emphasize its importance by suggesting a substantial breadth to its coverage. For instance, both attribution and assignment are designed to reach "each" of the classes of mail and types of service. Moreover, not only "direct" but also "indirect" postal costs are to be attributed, and thereafter a portion of "all other costs" of the Postal Service are to be assigned. Third, the emphasis throughout the subsection is unmistakeably upon cost-of-service principles. Under the subsection each service must bear the postal costs "attributable *to* [it]" and in addition must also bear that portion of all other costs "reasonably assignable *to* [it]" (emphasis added). Thus, the very words of subsection (b)(3) disclose its concern that each class of mail and postal service shoulder all the postal costs that may reasonably be traced to the provision of that class or service.

■ Giving the statute a plain reading it seems clear that the first of the subsection's

requirements of subsection 3622(b)(3) appeared "questionable at best." *Id.* at 406, 485 F.2d at 777.

Unless otherwise indicated all references to *American Publishers* hereinafter are to the concurring opinion of Chief Judge Bazelon in which Judges Tamm and Wyzanski joined.

**54.** *Id.* at 408, 485 F.2d at 779. As we observed there, "Section 3622(b)(3) is susceptible of a variety of interpretations." *Id.*

**55.** Section 3622(b) provides in full:

(b) Upon receiving a request, the Commission shall make a recommended decision on the request for changes in rates or fees in each class of mail or type of service in accordance with the policies of this title and the following factors:

(1) the establishment and maintenance of a fair and equitable schedule;

(2) the value of the mail service actually provided each class or type of mail service to both the sender and the recipient, including but not limited to the collection, mode of transportation, and priority of delivery;

(3) the requirement that each class of mail or type of mail service bear the direct and indirect postal costs attributable to that class

or type plus that portion of all other costs of the Postal Service reasonably assignable to such class or type;

(4) the effect of rate increases upon the general public, business mail users, and enterprises in the private sector of the economy engaged in the delivery of mail matter other than letters;

(5) the available alternative means of sending and receiving letters and other mail matter at reasonable costs;

(6) the degree of preparation of mail for delivery into the postal system performed by the mailer and its effect upon reducing costs to the Postal Service;

(7) simplicity of structure for the entire schedule and simple, identifiable relationships between the rates or fees charged the various classes of mail for postal services; and

(8) such other factors as the Commission deems appropriate.

**56.** *See* note 55 *supra; see also* pp. ——-——— of 186 U.S.App.D.C., pp. 588–589 of 569 F.2d *infra.*

dual requirements calls for something more than minimal attribution. Had Congress intended, for instance, that cost variability be acceptable as an exclusive method for identifying attributable costs, it in all likelihood would not have given seemingly equal importance to the attribution of indirect, as of direct, postal costs. Strictly speaking, indirect costs may not be attributed by cost variability, at least not by short-term variability; rather, attribution of such costs as a practical matter necessitates the use to some degree of cost allocation formulae based on accounting principles.[57] Moreover, the report of the conference committee confirms the view that Congress intended attribution under subsection 3622(b)(3) to extend beyond minimally attributable costs and to include to a significant extent those additional costs which, although not measurably variable and therefore not directly attributable, may nonetheless be determined with reasonable confidence to be the consequence of providing the service.[58]

■ A plain reading also clearly suggests that the other costs of the Postal Service that are to be "reasonably assigned" must also be allocated on cost-of-service principles. That is, after the process of extended attribution is complete, a portion of remaining costs are to be assigned to the various mail classes and postal services to the extent that it can reasonably be determined or estimated that certain classes of service may account for particular costs. As discussed above, a primary theme of subsection 3622(b)(3) is its concern with fully tracing the cost consequences of providing the various services. Legislative history, which is explored more thoroughly below, confirms that this theme pertains as much to assignment as to attribution.[59]

57. *See* 1 *A. Kahn, The Economics of Regulation: Principles and Institutions* 78 (1970).

58. H.R.Rep.91–1363, 91st Cong., 2d Sess. 87 (1970) (the attribution provision "establishes a floor for each class of mail equal to costs which consist of those costs, both direct and indirect, that vary over the short term in response to changes in volume of a particular class or, even though fixed rather than variable, are the consequence of providing the specific service involved").

59. *See* pp. ———–——— of 186 U.S.App.D.C., pp. 587–589 of 569 F.2d *infra*. The provision that the various postal services should bear the "operating costs, the amount of overhead, and other institutional costs of the Postal Service properly *assignable* to each class of mail or type of mail service" (emphasis added) was first contained in the Senate bill submitted to conference. *See* text at note 72 *infra*. Under this provision, each mail class or postal service, in addition to bearing "operating costs"—which one might reasonably equate with attributable costs—would also have been required to bear some portion of "overhead" and "other institutional costs of the Postal Service" at least to the extent that a cause and effect relationship between those costs and the mail class or postal service to which they were to be assigned could properly be determined. *See* S.Rep.91–913, 91st Cong., 2d Sess. 15 (1970); *see also id.* at 10. While more specifically directed to institutional costs in addition to operating costs than the House bill, the Senate provision paralleled in certain respects the House provision that "rates for each class of postal service cover the demonstrably related cost of such service." H.R.Rep.91–1363, 91st Cong., 2d Sess. 87 (1970) (conference report); *see* text at note 70 *infra*.

At conference the Senate's version was adopted with an amendment that strengthened the role of this particular subsection, *see* pp. ———–——— of 186 U.S.App.D.C., pp. 588–589 of 569 F.2d *infra*, and added the attribution provision discussed above. However, while adding this provision, the conference bill nonetheless retained almost verbatim the Senate language regarding the assignment of overhead and other institutional costs, making only the most minor, cosmetic changes—e. g., the applicable costs became described generally as "all other costs of the Postal Service," and "properly assignable" became "reasonably assignable."

In short, the "reasonably assignable" costs provision of subsection (b)(3) quite clearly continues the concept of its Senate bill predecessor that even overhead and other nonvarying institutional costs are to be allocated among the classes of mail and types of mail services on a cost-of-service basis to the extent it is reasonably possible to allocate specific costs to specific postal classes and services.

This interpretation of "reasonably assignable" costs fully comports with the significant differences between the ratesetting requirements of the preferred and nonpreferred classes of mail. Under subsection 3622(b)(3) a nonpreferred class of mail or type of mail service is required to bear, in addition to its attributable costs, that portion of the remaining costs reasonably assignable to it as well as any part of the residuum of costs that the Commis-

One last feature of subsection 3622(b)(3) is disclosed by giving the words of the statute their plain meanings. Congress did not intend that *all* postal costs be either attributed or assigned. Rather, the statute expressly provides that each class of mail or type of mail service must bear, in addition to its attributable costs, only "that portion of all other costs of the Postal Service *reasonably assignable* to such class or type" (emphasis added). Thus, some Postal Service costs will exist but will not be "reasonably assignable" to any particular class or type. The other factors enumerated in section 3622 will govern the allocation of these nonattributable and nonassignable costs. This makes good sense. With subsection 3622(b)(3) strengthened from a guideline into the only "requirement" among the eight ratesetting factors listed in section 3622, unless express provision were made for a third category of costs subsection 3622(b)(3) would be susceptible of an interpretation by which all the noncost factors of the remaining subsections could be read out of the Act. The conference report confirms that Congress acted expressly to prevent just such an interpretation.[60] While clearly the primary purpose of the Act's ratesetting provision is to assure that attribution and assignment in accordance with cost-of-service principles is carried out to the fullest extent reasonably possible, subsection (b)(3) provides at the same time for a residuum of costs to be used to give effect to the noncost factors expressly set forth in the Act.

Legislative history fully supports the plain reading of subsection 3622(b)(3) and reinforces the conclusion that first and foremost the Act requires that special efforts be made to maximize the use of cost-of-service principles in the allocation of postal costs.

Discrimination in postal ratemaking in favor of certain preferred classes of mail and to the great disadvantage of first class mail has long been a part of our postal system. As early as 1913 the Supreme Court, in *Lewis Publishing Co. v. Morgan,* 229 U.S. 288, 303–304, 33 S.Ct. 867, 870, 57 L.Ed. 1190 (1913), recognized that Congress designed its postal rate structure to discriminate among classes of mail, conferring "pecuniary advantages of great consequence" upon certain classes of mail, always at the expense of first class, based "upon the conceptions of Congress as to how far it was wise for the general welfare to give advantages to one class not enjoyed by another." This practice, increasingly more formalized through the years, continued until the time of the Postal Reorganization Act.[61]

---

sion discretionarily allocates to it, *see* pp. ———— of 186 U.S.App.D.C., p. 589 of 569 F.2d *infra.* By contrast, under section 3626, the section adopted at conference for the purpose of retaining certain rate preferences, *see* S. 3842, 91st Cong., 2d Sess. (1970), at § 3704(i), so long as Congress appropriates funds to offset the foregone revenue, *see* 39 U.S.C. §§ 2401(c), 3627, the rates for the preferred classes of mail or kinds of mailer must be set so that the revenues received from those rates will not, after a phasing-in period, *see* 39 U.S.C. § 3626(1), "exceed the direct and indirect postal costs attributable to mail of such class or kind (excluding all other costs of the Postal Service)." While both attributable and assignable costs, as used in subsection 3622(b)(3), involve inferences of causation, the latter concept permits a greater degree of estimation and connotes somewhat more judgment and discretion than the former. *But see* note 74 *infra.* It is the freedom from having to bear either these more speculative costs of service or any portion of the residuum costs that con-

stitutes the "preference" enjoyed by the classes of mail provided for in section 3626.

**60.** H.R.Rep.91–1363, 91st Cong., 2d Sess. 87 (1970) ("the conference substitute provides for a judgmental assignment of *some part* of the remaining costs") (emphasis added); *see also* note 59 *supra.*

**61.** For instance, in 1955 the Post Office Department formally adopted a rate–making formula which expressly provided that second and third class mail should be operated below cost and that the revenues thus lost should be recovered through increased rates for first class mail.

Second-class mail should produce revenues sufficient to recover 50 percent of costs assigned to it under the Cost Ascertainment System; third-class mail should recover 75 percent of such costs; and . . . the difference should be reallocated to first-class mail and domestic airmail in recognition of their higher service and value factors.

*Post Office Department Cost Ascertainment Report for FY 1955,* at III; *see* 1—859. And

In seeking postal reform through the 1970 Act it was a central and express aim of both Houses of Congress to end the abuses of this practice—to get "politics out of the Post Office." [62] Congress realized that the result of this purposeful discrimination—the setting of rates for some classes of mail well below that necessary to recover the costs of providing the service [63] —was symptomatic of the political process. Debate over the Act discloses that Congress was well aware of the extent to which the availability of preferential rates, and the political nature of postal ratemaking in general, attracted lobbyists into the ratesetting process and invited the abuses that not infrequently result from their influence.[64] A major thrust of the postal reform effort therefore was to minimize this attraction of lobbyist influence by severely curtailing the broad discretion that had characterized pri-

or ratesetting procedures and served to shield abuses of the system.[65]

The two Houses advanced different approaches for solving these problems. The Senate passed a bill that would have abolished all rate preferences, phasing in the expected rate increases over five and ten year periods to cushion the impact of the elimination of preferential treatment.[66] The House Bill, on the other hand, would have written into law the preferences then existing by providing that "the preferential rates accorded these categories of mail will not be changed except by Congress, unless the Congress fails to appropriate funds sufficient to cover the revenue foregone because of the rate preference." [67] Moreover, the two bills differed significantly in the guidelines they prescribed for distributing postal costs to set postal rates: while both proscribed discrimination,[68] the Senate Bill required a reasonable allocation of all costs,

the Postal Policy Act of 1958, the statutory predecessor to the present Act for purposes of rate-making, formalized the practice of requiring first class to bear its full costs plus a premium in order that the rates for the preferred classes could be set at less than full cost. *See* 39 U.S.C. §§ 2302(c), 2303 (1958), 72 Stat. 136. For the Post Office Department's explanation of the differential pricing permitted by the Postal Policy Act of 1958, *see Report on Post Office Department Relating to Survey of Postal Rate Structure,* House Doc. No. 91–97, 91st Cong., 1st Sess. 6 (1960).

**62.** H.R.Rep.No.91–1104, 91st Cong., 2d Sess. 6 (1970), U.S.Code Cong. & Admin.News 1970, pp. 3649, 3654; *see* S.Rep.No.91–912, 91st Cong., 2d Sess. 8 (1970).

**63.** "Under existing law, first-class mail and fourth-class parcel post are the only classes of mail in which there is any legislative requirement at all that they pay their full cost." S.Rep.No.91–912, 91st Cong., 2d Sess. 10 (1970); *see also* 116 Cong.Rec. 21712 (June 12, 1970) (remarks of Sen. McGee) ("Except for first-class mail, no class of mail comes anywhere close, right now, to paying its fair share of the costs.").

**64.** For instance, as Senator McGee noted:

The committee believes that if Congress is to separate itself from periodic battles over rate adjustments, we should make the separation complete. We should get the Congress out of the clutches of the lobby list. To retain any ratemaking power is to insure that our halls will be filled with the representatives of special interest groups who will, as

they always have, attempt to convince the Members of Congress that the world will truly come to an end if we raise the rate on their mail.

116 Cong.Rec. 21712 (June 26, 1970).

**65.** Most of the money in the postal system comes from first class mail. A 100% increase in the rate for all second class mail would not produce as much revenue as a 5% increase in the first class rate. The temptation to resolve the financial problems of the post office by charging the lion's share of all operational costs to first class is strong; that's where the big money is. The necessity for preventing the imposition upon the only class of mail which the general public uses is one of the reasons why the Postal Rate Commission should be independent of operating management. S.Rep.No.91–912, 91st Cong., 2d Sess. 13 (1970).

**66.** S. 3842, 91st Cong., 2d Sess. (1970), at § 3704(i); S.Rep.No.91–912, 91st Cong., 2d Sess. 10–13 (1970); *see also* Cong.Rec. 21712–13 (June 26, 1970).

**67.** H.R.Rep.No.91–1104, 91st Cong., 2d Sess. 18 (1970), U.S.Code Cong. & Admin.News 1970, p. 3666; *see* H.R. 17070, 91st Cong., 2d Sess. (1970), at § 1202.

**68.** *See* S. 3842, 91st Cong., 2d Sess. (1970), at §§ 101(c), 503(c); H.R. 17070, 91st Cong., 2d Sess. (1970), at § 401(c). *Compare* 39 U.S.C. §§ 101(d), 403(c).

including institutional costs,[69] whereas the House Bill provided only that each class of service would bear "at least those costs demonstrably related to [it]." [70]

These differences were subjected to conference bargaining. In exchange for the retention of enumerated preferences, the House accepted the Senate's standards for allocating costs.[71] Moreover, the standards of the Senate Bill, which in any event were more stringent than those proposed in the House Bill, were further strengthened at conference and expressly made applicable to all classes of mail (§ 3622(b)(3)) including the preferred classes (§ 3626). Subsection 3622(b)(3), which is the only 3622(b) ratemaking subsection which was not taken verbatim from the Senate Bill, was originally only a guideline that the Commission, in determining rates, consider "operating costs, the amount of overhead, and other institutional costs of the Postal Service properly assignable to each class of mail or type of mail service." [72] But when it emerged from conference this guideline had become "the *requirement* that each class of mail or type of mail service bear the direct and indirect postal costs attributable to that class or type plus that portion of all other costs of the Postal Service reasonably assignable to such class or type." [73] *See* note 59 *supra*.

It is quite apparent from this history that the conference committee amendments to subsection (b)(3) were designed to reemphasize the severe limitations that the Act places upon the Service's ability to set rates other than in strict accord with cost-of-service principles. Prior to the Act the Service enjoyed broad discretion in the allocation of postal costs, a discretion which in the past had made the setting of postal rates susceptible to political bartering and the frequently abusive influence of lobbyist efforts. We are persuaded that the conference committee amendments, which apparently were insisted upon by the Senate conferees in exchange for the major concession of retaining certain preferential classes of mail, were intended to clarify the extreme degree to which the Act restricts that prior, and quite problemful, discretion. In view of this it would be anomalous to construe subsection 3622(b)(3) as permitting a grudging use of cost-of-service principles which, by expanding the residuum of costs subject to discretionary allocation, simply preserves the potential for continuing the very same discriminatory treatment that the Act so clearly intended to remedy.

Subsection 3622(b)(3) provides, in short, that the Postal Rate Commission must first of all attribute to each mail class or postal service all postal costs which may reasonably be determined, through variability theory as well as through other reasonable inferences of causation, to be the consequence of providing the service. It must then distribute among the mail classes and services that significant portion of all remaining costs of the Postal Service that may reasonably [74] be assigned to each on the basis of best available cost-of-service estimates. The residuum of costs is subject to discretionary allocation in accord with the noncost factors set forth in the Act.

---

**69.** *See*, S. 3842, 91st Cong., 2d Sess. (1970), at § 3704(g)(3).

**70.** H.R. 17070, 91st Cong., 2d Sess. (1970), at § 1201(c).

**71.** *See* H.R.Rep.91–1363, 91st Cong., 2d Sess. 85–87 (1970); *see also* 1—864–65.

**72.** S. 3842, 91st Cong., 2d Sess. (1970), at § 3704(g)(3).

**73.** 39 U.S.C. § 3622(b)(3) (emphasis added). As we have previously noted, subsection 3622(b)(3) is the "most concrete" of the ratemaking guidelines contained in the Act. *Amer-*

*ican Publishers,* 157 U.S.App.D.C. at 406, 485 F.2d at 777.

**74.** We emphasize that "reasonably" as used in subsection 3622(b)(3) in connection with assignable costs must be read against the overall purpose of the section, which is to maximize the use of cost-of-service principles throughout postal ratemaking. Simply put it means that all reasonable efforts must be made to assign unattributed costs to the various classes of mail and service by use of acceptable cost-of-service estimates rather than to allocate them discretionarily as residual costs.

# 590

■ *b. Compliance with the Act.* In deciding whether the Commission's adopted ratemaking approach complies with the requirements of the Act we are not unmindful that the scope of our review is limited. Absent a specific statutory command to the contrary our task is simply to ensure that the Commission has followed proper procedures, that it has considered the relevant and excluded the irrelevant, and that its ratemaking order has produced no arbitrary result.[75] As we said in *American Publishers*, however, we must also be assured that the Postal Service has not "flouted a statutory command." [76]

The overriding feature of this case is the express mandate of subsection 3622(b)(3) that all reasonable efforts be made to trace the cost consequences of providing each mail class or service and to allocate postal costs on that basis to the fullest extent possible. In specifically requiring that the Commission endeavor to maximize the use of cost-of-service principles, Congress deliberately went beyond the general ratemaking requirement that rates be fair and equitable.[77] It is the Commission's duty therefore to respond faithfully and not grudgingly to this plain command of the statute, and it is equally our duty to carefully scrutinize responses to this particular aspect of the Act's overall ratesetting scheme and to reject efforts that fail to comply with this special requirement[78]—efforts which, in short, flout the express command of the Act.

*(1) Attribution.* There is no contention in this case that cost variability is an invalid starting point in the attribution of postal cost[79]—all the parties before us employ it to some extent. The issue rather is whether the Commission's reliance on cost variability, to the virtual exclusion of other considerations, is insufficiently responsive to the Act's express concern for extended attribution.[80]

Our task, of course, is not to prescribe an acceptable percentage level of attribution.[81] Nor are we charged with selecting from among alternative approaches available to the Commission the one approach which we deem most responsive to the underlying purposes of the Act. We are an appellate court, not an agency possessed of developed expertise. We look to the design of the Commission's approach not to substitute our judgment for that of the agency, but only to determine whether the Commission's adopted method falls unconscionably short of the statutory requirements.

As noted above, the Commission acknowledges that presently incomplete data pre-

---

**75.** *E. g., Permian Basin Area Rate Cases*, 390 U.S. 747, 790, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968); *American Publishers*, 157 U.S.App.D.C. at 404, 485 F.2d at 775 (Wyzanski, J.).

**76.** 157 U.S.App.D.C. at 404, 485 F.2d at 775 (Wyzanski, J.).

**77.** That postal rates be established that are "fair and equitable" is both an underlying premise of the Act, *see* 39 U.S.C. § 101(d), and a specific noncost factor which may be considered in allocating residual costs, *see* 39 U.S.C. § 3622(b)(1).

**78.** *See Colorado Interstate Gas Co. v. Federal Power Commission*, 324 U.S. 581, 589, 65 S.Ct. 829, 89 L.Ed. 1206 (1945).

**79.** *See generally J. Bonbright, Principles of Public Utility Rates* 337–68 (1961); *cf. New York v. United States*, 331 U.S. 284, 67 S.Ct. 1207, 91 L.Ed. 1492 (1947).

**80.** *See* pp. —–— of 186 U.S.App.D.C., pp. 585–589 of 569 F.2d *supra*.

**81.** The following table is a comparison of attribution percentages achieved by the various parties:

| | | | Commissioner | | |
| --- | --- | --- | --- | --- | --- |
| ALJ | OOC | UPS | Saponaro | USPS | PRC |
| 70.6% | 77.4% | 83.6% | 70.6% | 45.1% | 52.5% |

*See* 1—888, 940.

The ALJ, given his special role, might properly have given great weight to a comparison between the seemingly low percentage achieved under the Commission's approach and the much higher percentages generated by the alternative methodologies. He may in fact have determined implicitly that after five years of acquaintance with the Act, attribution of only 52.5% was simply not enough. *See* note 45 *supra*. But our role is quite different and our decision does not rest on any determination that a certain percentage level of attribution is dictated by subsection 3622(b)(3).

clude full attribution under its cost variability approach.[82] It insists, however, that utmost accuracy in the measurement of causation must prevail over all else.[83] In our view this allegiance to the goal of greatest possible accuracy fatally flaws the design of the Commission's adopted method since at present the Commission's goal may be obtained only by substantially disregarding the Act's express concern for extended attribution.

The Commission suggests, however, that it had no choice but to continue to rely on its cost variability methodology since each of the alternative approaches presented to it failed to meet the requirement that agency action be nonarbitrary and the product of reasoned decisionmaking.[84] We are unpersuaded. Attribution methods such as those used in the alternative approaches are not infrequently employed in agency ratemaking. *E. g., Domestic Passenger-Fare Investigation, Phase 9-Fare · Structure*, C.A.B., Order No. 74–3–82, Docket No. 21866–9 at 32 (March 18, 1974); *Domestic Service Mail Rate Investigation*, 47 C.A.B. 310, 312–14, 339 (1967); *Reopened Pan American Mail-Rate Case*, 35 C.A.B. 540, 546–47 (1962); *Area Rate Proceeding*, 34 F.P.C. 159, 192–93 (1965); *Atlantic Seaboard Corp.*, 11 F.P.C. 43, 56 (1952); *Mississippi River Fuel Corp.*, 4 F.P.C. 340, 353 (1945). Moreover, they have been upheld by the courts. *See· Permian Basin Area Rate Cases*, 390 U.S. 747, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968); *Colorado Interstate Gas Co. v. Federal Power Commission*, 324 U.S. 581, 65 S.Ct. 829, 89 L.Ed. 1206 (1945); *see also Commonwealth of Pennsylvania and New York State Department of Transportation v. Interstate Commerce Commission*, 175 U.S.App.D.C. 263, 535 F.2d 91 (1976); *Payne v. Washington Metropolitan Transit*

*Comm'n*, 134 U.S.App.D.C. 321, 340–41, 415 F.2d 901, 920–21 (1968).

To be sure, the use of average costs must be based on substantial evidence and reasoned findings. *See, e. g., Baltimore & Ohio Railroad Co. v. Aberdeen & Rockfish Railroad Co.*, 393 U.S. 87, 89 S.Ct. 280, 21 L.Ed.2d 219 (1968). But these alternative approaches, which the Commission labels and tries to dismiss as merely "accounting methods of costing," may not be put aside simply by asserting that "different judgments can produce highly different allocations of common costs, and there is no rational basis to choose one allocation over another."[85] The mere fact that a different formulation of the same distribution keys would result in a different overall attribution does not necessarily render the methodology arbitrary. In fact, the same criticism can be made of a cost variability methodology. As the Commission itself noted, the longer the time span chosen, the greater the percentage of costs which may be attributed on that basis: "[I]f the inputs are viewed over the extreme long-run . . . attribution would reach 100 percent."[86]

■ The point is that a ratemaking approach may not be disregarded simply because it lacks perfection;[87] to be acceptable a methodology need only be reasoned, nonarbitrary and permissible under the statute. As Judge Wenner candidly and aptly observed in criticizing his own method, "[d]oubtless more refined methods and judgments will be developed in future cases as more facts are discovered; but a space and weight allocation for transportation is a sound and workable solution to the problem at this stage of postal rate regulation."[88] *Compare Commonwealth of Pennsylvania*

---

**82.** *See* note 35 *supra*.

**83.** *See* pp. ———— of 186 U.S.App.D.C., pp. 581–582 of 569 F.2d *supra*.

**84.** *E. g., Greater Boston Television Corp. v. Federal Communications Commission*, 143 U.S. App.D.C. 383, 393, 444 F.2d 841, 851 (1970), *cert. denied*, 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971).

**85.** 1—596 (footnote omitted).

**86.** 1—609.

**87.** *See Commonwealth of Pennsylvania and New York State Department of Transportation v. Interstate Commerce Commission*, 175 U.S. App.D.C. 263 at 268, 535 F.2d 91, at 96 (1976).

**88.** 1—6 (footnote omitted).

*and New York State Department of Transportation v. Interstate Commerce Commission,* 175 U.S.App.D.C. 263, 535 F.2d 91 (1976); *Domestic Service Mail Rate Investigation, supra,* 47 C.A.B. at 317. The alternative approaches presented to the Commission seem plainly to have been reasonable efforts motivated by a concern for fuller attribution and designed simply to go beyond the inferences of causation presently derivable under a cost variability theory.[89] We are unpersuaded that the Commission may properly disregard them as unsupported in the record and irrational.[90]

We conclude that in the circumstances of this case the Commission's almost exclusive reliance on a cost variability approach to attribution contravenes a primary purpose of subsection 3622(b)(3) and therefore fails to comply with the Act.[91]

*(2) Assignment.* The Commission's value-of-service approach to assignment of unattributed costs also fails to comply with a plain requirement of the Act. The Commission clearly misreads the second part of subsection 3622(b)(3). It interprets the "reasonably assignable" costs provision of subsection (b)(3) as wholly unrelated to cost-of-service considerations and directed instead only to the judgmental distribution of unattributed costs on the basis of the noncost factors contained in section 3622(b) and especially the value-of-service consideration of subsection (b)(2).[92] As we have explained, however, "reasonably assignable" costs must be allocated in accordance with cost-of-service principles, and it is only residual costs which are subject to discretionary distribution to give effect to the noncost factors.[93] We conclude that the Commission's present method for assigning unattributed costs proceeds from a faulty premise in contravention of the Act and therefore must be rejected.[94]

We wish to emphasize that our holding with regard both to attributable and assignable costs is narrow. Our duty in this case is not to prescribe any one methodology,

---

**89.** *See* 1—878.

**90.** *See* 1—585-86.

**91.** The Commission's attribution of "specific fixed costs," *see* note 32 *supra,* does not affect our holding. At least as presently implemented that modification to the Commission's reliance on cost variability is so minimal as to be insignificant when viewed against the statute's express concern for extended attribution.

**92.** This interpretation, although clearly wrong, is certainly understandable as a reaction to our preliminary assessment of subsection 3622(b)(3) in *American Publishers.* While our analysis in that case emphasized the special role that cost-of-service principles must play in postal ratemaking, it did not clearly expose the extent to which these principles infuse not only "attributable" costs but "reasonably assignable" costs as well.

**93.** *See* pp. —————— of 186 U.S.App.D.C., pp. 584–589 of 569 F.2d *supra.*

**94.** Even viewing the Commission's use of value-of-service in the more limited context as an approach for allocating only residual costs, *i. e.,* those costs permissibly subject to allocation-based noncost considerations, there is serious doubt whether such an approach is authorized under the Act. First, under present circumstances, where even the Commission concedes that every class of mail is demand inelastic at current and reasonably foreseeable rates, *see* 1—640, it may be questioned whether the Commission is able to meet the requirement that value-of-service be employed only where *all* farepayers, even those discriminated against, are benefitted. *See Payne v. Washington Metropolitan Transit Comm'n,* 134 U.S.App.D.C. 321, 336–37, 415 F.2d 901, 916–17 (1968). For an example of circumstances in which discriminatory, value-of-service pricing may "result in lower fares to the public as a whole," *id.* at 336, 415 F.2d at 916 (footnote omitted), *see J. Bonbright, Principles of Public Utility Rates* 309 (1961); *see also id.* at 383.

Second, even if proper circumstances did prevail, *i. e.,* if at least one class of mail were demand elastic, it is doubtful whether the Commission could properly employ the inverse elasticity rule, as it apparently did here, as a mechanical device to take into account through a single formula *all* the noncost factors set forth in the Act. *See* 1—627. The Commission is required to exercise its discretion in fact, and under the terms of the Act this may necessitate that it give individual and specific consideration to each of the enumerated noncost factors even if after such consideration it properly decides not to vary from proportional markups on the basis of any particular factor. *Compare Payne v. Washington Metropolitan Transit Comm'n, supra,* 132 U.S.App.D.C. at 338–39, 415 F.2d at 918–19.

and nothing we say here should be taken as approving in advance any particular approach. The selection of one approach from among acceptable alternatives is a matter for agency expertise. We hold only that in the circumstances of this case neither the Commission's reliance on cost variability as the key to attribution nor its use of demand theory as a premise for allocation of unattributed costs complies with the Act because both plainly contravene in different ways the express statutory command that in setting postal rates every reasonable effort be made to employ cost-of-service principles to the fullest extent possible.[95]

### III. NOS. 75–2227, 75–2228 AND NO. 75–2238:

### THE ATCMU AND THE STATE OF MAINE CASES

The remaining cases involve the most recent ratemaking proceeding (docket no. R76–1) and raise challenges, on procedural (ATCMU) and substantive (State of Maine) grounds, to the Postal Service's authority in the circumstances of this case to propose permanent increases in fees for special services and to authorize temporary postal rates to be in effect pending completion of Commission proceeding in docket no. R76–1.

At its September 4, 1975 Board meeting, immediately after the Governors issued the rate order contested in NAGCP, the Board convened and discussed the need for further increases in postal rates and fees. After reviewing the "general magnitude" [96] of the increases management deemed appropriate, the Board authorized the Postal Service to submit a request for postal rate increases with the Commission by September 19 and further authorized the Service unilaterally to increase "fees for various special services . . . after allowing a period for public notice and comment on the proposed increases." [97] On September 18, without obtaining Board review of the completed request, the Postal Service filed the rate request with the Commission.[98] Also pursuant to the Board's directive the Postal Service, on September 19, announced its intention to increase fees for various special services and solicited comments of interested parties.[99]

On October 9, the Postal Service published notice that it would impose temporary rate increases on December 28, 1975, in substantially the same amounts as the requested permanent rates, unless by December 18 the Commission had transmitted its recommended decision to the Governors.[100] The proposed increases in fees for special services were scheduled to take effect on January 3, 1976.[101]

95. Adapting to the requirements of subsection 3622(b)(3) should not prove too great a burden on the Commission. Obviously there is no bright line distinction between those costs properly attributable under extended inferences of causation and those properly assignable through best available cost-of-service estimates. *But see* note 59 *supra.* Of far greater importance than any definitive and categorical definition of "attributable" or "assignable" as used in subsection 3622(b)(3) is the explicit requirement that postal costs, however characterized, be allocated in accordance with cost-of-service principles to the fullest extent reasonably achievable. *See also* note 74 *supra.*

96. Minutes of the September 4, 1975 Meeting of the Board of Governors of the United States Postal Service, at 3–5 [hereafter cited as "September 4 Minutes"].

97. *Id.* at 5.

98. 40 Fed.Reg. 44044 (Sept. 24, 1975). On October 8, 1975, appellee Associated Third Class

Mail Users filed an objection with the Commission asking the Commission to return the request to the Postal Service on grounds that the completed request was never reviewed or approved by the Board. The Commission dismissed this objection on October 21. Brief for Appellee Associated Third Class Mail Users, at 7.

99. 40 Fed.Reg. 43233 (Sept. 19, 1975).

100. 40 Fed.Reg. 4787 (Oct. 9, 1975).

101. While the notice published by the Postal Service did not specify a date when the proposed increases would be put into effect, a subsequent press release indicated plans to implement the increases in early November 1975. Memorandum of Points and Authorities of Plaintiff Associated Third Class Mail Users in Support of Motion for Preliminary Injunction, Appendix (Nos. 75–2227, 75–2228), at 28. Still later the Postal Service announced that the

On October 29 appellant State of Maine, representing itself and sixteen other states, filed a complaint in district court raising substantive arguments and seeking declaratory and injunctive relief to prevent the Postal Service from implementing the temporary rate increases. (No. 75–2238) Two days later appellee ATCMU filed suit seeking similar relief on procedural grounds against the proposed fees as well as the temporary rates.[102] (Nos. 75–2227, 75–2228)

On November 7 the Board, noting the complaint filed by ATCMU, met and resolved that the Board action at the September 4 meeting was consistent with the Board's prior practice.[103] On December 16, however, the district court, in ruling on ATCMU's complaint, concluded that the Postal Service had not complied with the procedural requirements of 39 U.S.C. § 3601 et seq.,[104] as implemented through the Board's Operating Procedures. Accordingly, on the parties' cross motions for summary judgment, the Court, on December 16, entered judgment for appellee ATCMU and enjoined the Postal Service from putting the temporary rates into effect or from implementing the fee increases until it submitted to the Commission an appropriate request and otherwise complied with the requirements of section 3601 et seq. On the same day, in the State of Maine case, the district court denied appellant's motion for preliminary injunction, and on December 18, on appellant's unopposed motion, entered final judgment against State of Maine.[105]

On December 19 the Board convened a special meeting to take action in response to the injunction entered in the ATCMU case. After reviewing the "specific rates and fees to be requested" as well as "full supporting data and documentation," the Board directed the Postal Service to submit appropriate requests to the Commission.[106] The rate request was resubmitted the same day; the request for changes in fees for special services was submitted January 5, 1976.

Appeals were taken from the district court judgments in both cases. In the ATCMU case appellant Postal Service moved this court for summary reversal or, alternatively, a stay of the district court order pending appeal. At the same time appellant State of Maine sought an injunction of the increases pending appeal. On December 29, 1975, after hearing argument in both cases, we denied State of Maine's request for an injunction, denied the Postal Service's motion for summary reversal, but granted the Service's alternative motion for stay, limiting its effect to the temporary rates. As a result the Postal Service, on December 31, put the temporary rates, including the 13 cent first class rate, into effect. The fees for special services, however, remained subject to the district court injunction.

We will address each case in turn.

### A. The ATCMU Case.

 On the merits,[107] we will address separately the two distinct issues presented

---

proposed increases would go into effect January 3, 1976. *Associated Third Class Mail Users v. United States Postal Service,* 405 F.Supp. 1109 (D.D.C. filed Dec. 16, 1975), at 1111 [hereafter cited at *ATCMU Opinion*].

**102.** Appellee National Easter Seal Society for Crippled Children and Adults, after being granted leave to intervene as plaintiff, filed a complaint limited to the issue of fees.

**103.** Minutes of the November 7, 1975 Meeting of the Board of Governors of the United States Postal Service, at 1–2 [hereafter cited as "November 7 Minutes"].

**104.** Chapter 36, 39 U.S.C. § 3601 et seq., sets forth the procedure of rate request, Commission hearing, recommended decision, and Gov-

ernors' order. *See* discussion at text accompanying notes 8–15 *supra.*

**105.** The court treated the preliminary injunction hearing as a consolidated hearing on the merits. *See* Rule 65(a)(2), Fed.R.Civ.Pro.

**106.** Minutes of the December 19, 1975 Meeting of the Board of Governors of the United States Postal Service, at 2–3 [hereafter cited as "December 19 Minutes"].

**107.** The appeal need not be dismissed as moot. True, the district court injunction has expired by its own terms now that the 90 days required in section 3641 have elapsed since the Postal Service, in compliance with the terms of the order, resubmitted its rate request on Decem-

in this case: first, whether the Postal Service is authorized unilaterally to establish fees for special services, and secondly, whether the Postal Service's September 18 request for postal rate increases was validly submitted to the Commission.

 *1. Proposed Changes in Fees for Special Services.* The first issue turns on whether the fees for the kinds of special services at issue in this case [108] are "fees for postal services" within the meaning of 39 U.S.C. § 3622. If so, then they fall within the Commission's jurisdiction and as such may be changed only in compliance with the Chapter 36 procedure of request, Commission hearing, recommended decision, and Governors' order. Appellees contend, and the district court held, that these services would be considered postal services in ordi-

nary parlance and that the fees set for these services have substantial public effect.[109] The court concluded therefore that under the most reasonable interpretation of Chapter 36 of the Act these fees are subject to the Commission's jurisdiction. Appellants argue, however, that the Act meant to continue the distinction drawn under prior postal legislation between postal and special services and that under this distinction the Postal Service retains the authority unilaterally to change the fees for the services here involved, which it denominates special nonpostal services. Without adopting all the reasoning of the district court on this point, we find its interpretation of the Act persuasive and its holding legally correct and adequately supported.[110]

ber 19 and submitted an initial request for increases in fees for special services on January 5. However, it is well settled that "voluntary cessation of alleged illegal conduct does not deprive the tribunal of power to hear and determine the case, *i. e.,* does not make the case moot." *United States v. W. T. Grant,* 345 U.S. 629, 632, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953). The submissions of December 19 and January 5 were a direct and voluntary response to the district court order at issue in this case. And rather than there being " 'no reasonable expectation that the wrong will be repeated,' " *id.* at 633, 73 S.Ct. at 897 (footnote omitted), the Postal Service's corrective action here clearly was taken under protest and in expectation of appeal. *See United States v. Trans-Missouri Freight Ass'n,* 166 U.S. 290, 308, 17 S.Ct. 540, 41 L.Ed. 1007 (1897). The "voluntary cessation of allegedly illegal conduct" exception to mootness thus applies here. *See also DeFunis v. Odegaard,* 416 U.S. 312, 318, 94 S.Ct. 1704, 40 L.Ed.2d 164 (1974).

Moreover, given ATCMU's abiding and continuing interest in the setting of postal rates and fees that comply with the Act and the Postal Service's expressed view that the order here at issue was in error, there is "a reasonable expectation that the same complaining party [will] be subjected to the same action again." *Weinstein v. Bradford,* 423 U.S. 147, 149, 96 S.Ct. 347, 349, 46 L.Ed.2d 350 (1975). Yet, because an order such as this is by its nature short-lived, the dispute will evade review, or at least considered plenary review, unless the appeal is heard now. Therefore, the "capable of repetition, yet evading review" exception to mootness is also applicable here. *E. g., Nebraska Press Ass'n v. Stuart,* 427 U.S. 539, 546, 96 S.Ct. 2791, 2797, 49 L.Ed.2d 683 (1976); *Sosna v. Iowa,* 419 U.S. 393, 397–403, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975); *Pacific*

*Terminal Co. v. ICC,* 219 U.S. 498, 515, 31 S.Ct. 279, 55 L.Ed. 310 (1911); *Golden Holiday Tours v. CAB,* 174 U.S.App.D.C. 292, 531 F.2d 624, 626 (1976). *See also* note 21 *supra.*

**108.** The services in question include: (1) the furnishing of mail list corrections; (2) the privilege of prepayment of postage without stamps; (3) the forwarding or returning of undeliverable mail; (4) the registry of mail; (5) the insurance of mail; (6) the provision of COD mail; (7) the certification of mail; (8) the securing of a signed receipt upon the delivery of mail and the returning of it to the sender; (9) special delivery; (10) the special handling of mail; (11) the provision of money orders. *See* 40 Fed.Reg. 43233–34 (Sept. 19, 1975).

**109.** *ATCMU Opinion,* at 1115–1116.

**110.** Ordinarily, of course, a reviewing court must give great deference to the interpretation given a statute by the agency charged with its administration, *e. g., Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965), and should not substitute its judgment for that of the agency's construction is reasonable, *e. g., Train v. Natural Resources Defense Council, Inc.,* 421 U.S. 60, 87, 95 S.Ct. 1470, 43 L.Ed.2d 731 (1975). Both the district court and this Court have been informed by this principle in analyzing the interpretation of the Act offered by the Postal Service and in rejecting it, after giving the Service due deference, as a construction too "curious" and "narrow" to prevail over a commonsense reading of the statute. *See* note 113 *infra* and accompanying text. We note at the outset, however, a peculiarity of this case which lends further support to our conclusion. The Postal Rate Commission, which at the very least is a co-partici-

Section 3622 of the Act establishes the Commission's jurisdiction over "changes in a rate or rates of postage or in a *fee or fees for postal services.*" [111] Other sections of the Act indicate that use of the phrase "fees for postal services" was not inadvertent and was intended to mean something quite apart from "rates of postage." For instance, where a particular section applies only to rates for postage, the phrase "fees for postal services" is omitted.[112] Since the Act provides no specific definition of "postal services," however, we must construe its meaning within the purposes of the Act, looking to legislative history where the words themselves, read plainly, are inadequate. *See* note 110 *supra.*

Giving "postal services" a plain meaning, all of the services here at issue may reasonably be so classified. With one possible exception, each clearly involves an aspect in the posting, handling and delivery of mail matter. *See* note 108 *supra.* As for the one possible exception—money orders—it is undisputed that the great majority of these are sent through the mail and that therefore the provision of money orders may itself reasonably be viewed as intimately a part of postal services. Appellants, however, offer a somewhat curious construction of the phrase that would exclude all of these services. They would define postal services to include only a few items such as bulk mailings and use of business reply mail, for which flat fees are charged, and Saturday delivery of mail and home delivery of mail in rural areas, for which no fee at present is charged. They would exclude in general apparently all services not intimately connected with the actual delivery of mail.

Appellants fail to provide, however, any reasonable basis for their restrictive construction or any reason whatsoever why it should prevail over a commonsense interpretation.[113] Moreover, section 3621, which provides that "[p]ostal rates and fees shall be reasonable and equitable," applies specifically to "rates of postage and fees for postal services." [114] Applying appellants' construction to section 3621 would lead to the improbable conclusion that while Congress was concerned that fees for such comparatively limited services as bulk mailing be fair and equitable, it was not at the same time concerned that fees for the more generally used services of special delivery and certified mail also be fair and equitable.[115] Absent a well reasoned explanation, and none has been provided to us, we cannot accept a construction that necessitates such curious results.

In sum, we agree with the district court that a plain reading is the proper reading of section 3622: "postal services" as used

pant with the Postal Service in the administration of the Act's ratesetting process, took the somewhat unusual step in this case of filing with the district court its own memorandum of law on the fees for special services issue. In that memorandum the Commission advances an interpretation of the Act quite at odds with that of the Service and fully in accord with the conclusion reached by the district court. *See* Memorandum of Law by the Postal Rate Commission, at 1, in Appendix at 121 ("the Commission's official position on the [fees] issue . . . has historically been opposed to that of the . . . Postal Service"). The district court, in short, without expressly stating so might simply have deferred to a long-held and reasonable interpretation given the statute by the very agency whose jurisdiction is at issue.

**111.** 39 U.S.C. § 3622(a) (emphasis added).

**112.** *See* 39 U.S.C. §§ 3626, 3627, 3683.

**113.** We are reminded on numerous occasions that " 'the plain, obvious and rational meaning of a statute is always to be preferred to any curious, narrow, hidden sense that nothing but the exigency of a hard case and the ingenuity and study of an acute and powerful intellect would discover.' " *Lynch v. Alworth-Stephens Co.,* 267 U.S. 364, 370, 45 S.Ct. 274, 276, 69 L.Ed. 660 (1925), *quoted in Chandler v. Roudebush,* 425 U.S. 840, 847, 96 S.Ct. 1949, 1953, 48 L.Ed.2d 416 (1976). *See also* note 110 *supra.*

**114.** 39 U.S.C. § 3621.

**115.** Nor can appellant convincingly argue that "fees for postal services" means something different in 39 U.S.C. § 3622 (establishing the Commission's jurisdiction) than in 39 U.S.C. § 3621 (establishing the Governor's authority to fix rates). *See, e. g., Atlantic Cleaners & Dyers v. United States,* 286 U.S. 427, 52 S.Ct. 607, 76 L.Ed. 1204 (1932).

there is a generic term and was meant to include all the special services here at issue.

Appellants' arguments based on prior legislation do not convince us to the contrary. It is true that prior to the Act the fees here involved were denominated "fees for special service" and were prescribed by the Postmaster General,[116] while postal rates and fees were set by Congress.[117] The argument that this distinction was preserved in the Act, however, ignores the fundamental change Congress intended in creating the Postal Rate Commission. More than this the argument rests on a wholly unconvincing construction of scattered sections of the Act.

Appellants argue, for instance, that section 4(a) of the Act, by "transferr[ing] to the United States Postal Service all the functions, powers, and duties of the Post Office Department and the Postmaster General of the Post Office Department,"[118] evidences an intent to preserve the distinction and to maintain in the Postal Service unilateral authority to establish fees for special services. But section 4(a) was clearly only a transitional provision designed to assure that there would be no lapse in the rendering of services as the old Post Office Department became the new Postal Service. It taxes credibility to believe that Congress, after devoting an entire chapter of the Act to defining the powers and duties of the Postal Service, would then use such an obscure device to transfer significant additional power.

■ Reliance on 39 U.S.C. § 404(6) is equally without merit. Section 404(6) vests the Postal Service with power "to provide, establish, change, or abolish special[,] nonpostal or similar services."[119] Appellants argue that this, as well as the absence in section 3622 of any specific mention of "special services," establishes its power unilaterally to set fees for those services. But

the power to establish, change or abolish certain services does not necessarily include the additional and distinct power to set the fees for those services. And the doctrine that a general powers provision like section 404(6) may not ordinarily override a specific provision such as section 3622 further undermines appellants' position. *Cf. Maiatico v. United States,* 112 U.S.App.D.C. 295, 301, 302 F.2d 880, 886 (1962).

■ But most of all, any reasonable examination of the purposes of the Act discloses Congress' implicit design that the distinct functions of service provision and rate adjustment be divided between the Postal Service and the Rate Commission. The expertise of the Postal Service supposedly is in management, and its authority therefore reasonably extends to basic decisions pertaining to the provision of special, nonpostal and other services. The Postal Rate Commission, however, was created specifically to oversee the ratemaking process. Its expertise is in the setting of rates and fees that are fair and equitable, and its authority therefore reasonably extends to all aspects of such decisions, including review of budget estimates, allocation of postal costs, establishment of rates for postage, *and,* it would seem plainly, the setting of fees for those special services which management decides should be provided.

Finally, legislative history clearly belies the contention that Congress intended to continue the prior authority vested in the Postmaster General to establish fees for special services unilaterally. That prior authority was contained in former section 507. But section 507 was specifically repealed and no analogous provision enacted in its place. Moreover, this repeal clearly was not inadvertent since provisions dealing specifically with section 507 authority were included in the postal reform bill which

---

116. *See* 39 U.S.C. §§ 507, 5009, 5010 (1964 ed.); 39 U.S.C. § 4106 (1964 ed., Supp. V).

117. *See, e. g.,* 39 U.S.C. §§ 4253, 4452 (1964 ed.).

118. 39 U.S.C. § 201 (note).

119. It is generally agreed that the absence of a comma between "special" and "nonpostal" was inadvertent. *ATCMU Opinion,* at 1117 n. 2.

passed the House [120] but were deleted from the bill finally enacted.

In short, a plain reading of the Act, its legislative history, and the purposes implicit in the creation of an independent Postal Rate Commission whose members "shall be chosen on the basis of their professional qualifications," 39 U.S.C. § 3601, all support the district court's conclusion that the Commission's jurisdiction extends to all the fees for special services involved in this case. We therefore affirm the district court order as it pertains to the fees involved in this case.

2. *Request for Changes in Postal Rates and Fees.* The remaining issue—whether the Postal Service's request for changes in postal rates was valid when submitted on September 18—turns on quite different considerations. On this issue the jurisdiction of the Commission is conceded. The only question is whether the request, as submitted September 18 or as affected by the Board action taken November 7, met all applicable requirements for proper submission. The district court reasoned that under the Act and the Board's own regulations "the Board must have before it for its consideration at the time it approves the request, the specific rates and fees to be requested." [121] In granting appellee the injunctive relief requested, the court concluded that since the specific rates and fees were not presented to the Board prior to September 18, when the Postal Service submitted the request to the Commission, temporary rates based upon that request could not lawfully be implemented.[122] Appellants' contrary arguments do not convince us that the district court's order must be reversed.

Under the Act only the Board has the authority and the power to make requests for recommended decisions on changes in postal rates and fees, which requests must be based on the determination that such changes would be in the public interest and in accordance with the policies of the Act.[123] At the time in question here the submission of rate requests was governed by certain Operating Procedures adopted by the Board.[124] Subparagraph eight of those Procedures enumerates as one matter specifically "reserved for decision by the Board of Governors":

> Requests to the Postal Rate Commission for recommended decisions on postal rates and mail classification, and action upon such recommended decisions.[125]

Read plainly the meaning of this specifically reserved authority is clear: the Postal Service must obtain the Board's approval of the request it proposes to submit to the Commission. Moreover, absent a clear and authoritative indication to the contrary the reasonable interpretation of this provision is that it is the request itself, not some preliminary study or working paper, that must be submitted for prior Board approval.

Appellants contend, however, that under subparagraph eight the only decision specifically reserved is the threshold determination whether to submit any request at all and that once that decision is made the Service is free to submit a request without first presenting the Board with the specifics of the rate changes it intends to propose or the data in support thereof. An examination of the Operating Procedures as a whole belies appellants' contention.[126]

---

120. H.R. 17070, 91st Cong., 2d Sess.; *see also* H.R.Rep.No.91–1104, 91st Cong., 2d Sess. 46 (1970), U.S.Code Cong. & Admin.News 1970, p. 3649 (section 507 specifically rescinded).

121. *ATCMU Opinion,* at 1113.

122. *Id.* at 1114–1115.

123. *See* 39 U.S.C. §§ 202(a), 404(2), 3622(a).

124. *See* 39 C.F.R. § 211.2 (1975).

125. Board of Governors of the United States Postal Service, Operating Procedures (December 1971), at 3–4 [hereafter cited as Operating Procedures]. The Act generally permits the Board to delegate the authority vested in it to the Postmaster General, *see* 39 U.S.C. § 402, and the Board has delegated some of its authority, *see* 39 C.F.R. § 3.9 (1975). Subparagraph eight is a specific reservation from that delegation.

126. We recognize that the Postal Service's interpretation of subparagraph eight is entitled to some deference at least so long as it is reasonable and has been followed with some consisten-

A primary purpose behind adoption of the Procedures was to insure that the Board "obtains the data" upon which to base those decisions "of sufficient importance, in the judgment of the Board, to require Board action." [127] Two considerations are persuasive evidence that the threshold determination whether to submit any request at all is not such an "important" decision, whereas approval of management's finalized proposal is. For one, the Act itself devalues that threshold decision by requiring that a request be submitted whenever postal expenses substantially exceed postal income.[128] More than this, the Operating Procedures provide separately that the Board need not initially decide but need only "review, and approve as appropriate," management's determination that there is a "need for rate increases or decreases," a determination which in effect controls the threshold decision whether a request must be submitted.[129] Unless this separate provision is simply redundant—and the Procedures appear too carefully constructed to support that inference—subparagraph eight must reserve for the Board something other than simply that threshold decision. In light of the underlying purpose of the Pro-

cedures, *i. e.,* to assure the Board the data necessary for decision, the only reasonable interpretation is the very one that a plain reading suggests: prior to submission the Board must review and approve the request itself, including the specific changes proposed by management and the supporting data.

It is clear, moreover, that under this interpretation the presentation made at the September 4 Board meeting fell substantially short of the requirements of subparagraph eight. Indisputably, at the time of that meeting the process of preparing a rate request "was still incomplete." [130] Indeed, the Board's instructions to management were "that the Postal Service should complete the process of refining its proposed filing with the Rate Commission." [131] And in fact, one day after the Board meeting a Postal Service press release announced that "[t]he exact amounts of the increases to be requested have not been finally determined." [132]

We conclude that on the record properly before us the September 4 presentation failed to comply with the plain requirements of the Operating Procedures.[133]

cy. *See, e. g., Skidmore v. Swift & Co.,* 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944); *see generally* 1 *K. Davis, Administrative Law Treatise* §§ 5.03–5.06 (1958 ed. and Supp.1970). As explained at pp. ———— of 186 U.S. App.D.C., p. 599 of 569 F.2d above, however, the Postal Service's interpretation, to say the least, places a curious construction on seemingly plain words, is difficult to square with the express purpose of the Procedures, and causes conflict among otherwise harmonious provisions. *See Morton v. Ruiz,* 415 U.S. 199, 237, 94 S.Ct. 1055, 39 L.Ed.2d 270 (1974); *see also* note 113 *supra.* And there is an even more serious problem with a construction of subparagraph eight under which all that need be approved in advance is the general magnitude of proposed increases. Like the post hoc interpretation given by the Board at its November 7 meeting, the Service's interpretation is significantly at variance with the meaning that has attached to the Operating Procedures by virtue of the Board's longstanding and consistent practice of approving the submission of a rate request only after reviewing the specific rates that management intends to propose to the Commission. *See* pp. ———— of 186 U.S.App.D.C., p. 600 of 569 F.2d *infra.* In the presence of such a variance from

previously consistent interpretation, and especially where the more recent construction is offered in the midst of litigation over the administrative rules in question, the amount of deference due the agency's interpretation diminishes substantially. *Morton v. Ruiz, supra.*

127. *See* Operating Procedures, at 2.

128. *See* 39 U.S.C. §§ 3621–22.

129. Operating Procedures, at 7.

130. And there is no evidence that the Board reconvened to review the completed rate request prior to its submission on September 18.

131. September 4 Minutes, at 4–5.

132. United States Postal Service General News Release, September 5, 1975.

133. The Postal Service argues, however, that despite the clear implications of the minutes of the Board meeting and the press release, the Board did have before it on September 4, in the form of a display chart, the specifics of the

The action taken by the Board at its November 7 meeting does not affect our conclusion. At that meeting, convened specifically "because litigation involving interpretation of the Operating Procedures had been initiated," the Board did not review any data other than that available September 4. Instead, it discussed whether the September 18 submission was consistent with its interpretation of the Operating Procedures and with the Board's prior practice, and it "unanimously agreed that the presentation, discussion, and Board actions at the September 4 meeting, in regard to the proposed request to the Postal Rate Commission, fully satisfied the requirements of the pertinent provision of the Operating Procedures." [134]

■■■■ Despite the presumptions generally surrounding administrative action, the deference due an agency's interpretation of its own regulations will depend at least somewhat on the degree to which it is well reasoned and consistent with prior interpretations and action. *E. g., Morton v. Ruiz,* 415 U.S. 199, 237, 94 S.Ct. 1055, 39 L.Ed.2d 270 (1974); *see generally,* 1 *K. Davis, Administrative Law Treatise,* §§ 5.03–5.06 (1958 ed. and Supp.1970). Where the words in question, as here, do not require any special competence for their interpretation, a court may well be equally or better qualified to interpret them than is the agency, at least where the agency's interpretation is offered in the wake of litigation which turns on those very regulations. [135] *See*

*Morton v. Ruiz, supra; Skidmore v. Swift & Co.,* 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944); *State of Delaware v. Bender,* 370 F.Supp. 1193, 1204 (D.Del.1974); *cf. McKart v. United States,* 395 U.S. 185, 197–98, 89 S.Ct. 1657, 23 L.Ed.2d 194 (1969).

The interpretation offered here—that the Board's September 4 approval of the "general magnitude" of the changes to be proposed in management's not then finalized request fulfilled the Board's obligation under the specific reservation of subparagraph eight—seems hardly reasonable and consistent with a plain reading of the Operating Procedures as discussed earlier. *See D. C. Federation of Civic Associations v. Volpe,* 316 F.Supp. 754, 784–85 (D.D.C.1970), *reversed on other grounds,* 148 U.S.App.D.C. 207, 459 F.2d 1231 (1972), *cert. denied,* 405 U.S. 1030, 92 S.Ct. 1290, 31 L.Ed.2d 489 (1972). Nor is it consistent with prior practice. To the contrary, minutes of previous Board meetings indicate that both at the time of the first submitted request, which predated adoption of the Operating Procedures, and the second request, which postdated their adoption, the Board reviewed and approved the very request that management proposed to submit to the Commission.[136]

■■■ We conclude that the Board's action at the November 7 meeting is not a controlling interpretation of the Operating Procedures and does not require variance from the interpretation discussed above.[137]

---

very rate request to be submitted to the Commission. That chart, however, is not a part of the public record of the September 4 proceedings before the Board, and appellants did not even offer it into evidence in the district court. Brief for the Appellants, at 8 n. 2. It has never been made available to appellees. Brief for Appellee ATCMU, at 32–33. Accordingly, the chart is not properly before us and will not be considered on this appeal, whatever its implication. *See Thomson v. Gaskill,* 315 U.S. 442, 62 S.Ct. 673, 86 L.Ed. 951 (1942); *Drake v. Finance Corp. of Louisiana,* 119 F.2d 588 (5th Cir. 1941).

**134.** November 7 Minutes, at 1–2.

**135.** *Compare Fleming v. Van Der Loo,* 82 U.S. App.D.C. 74, 80, 160 F.2d 906, 912 (1947), *with*

*Udall v. Tallman,* 380 U.S. 1, 17, 85 S.Ct. 792, 13 L.Ed.2d 610 (1965).

**136.** *See* Minutes of the Meeting of the Board of Governors of the U.S. Postal Service, on January 26, 1971; Minutes of the Meeting of the Board of Governors of the U.S. Postal Service, on September 10, 1973.

**137.** The Board attempted to buttress its offered interpretation by including in the minutes statements of "members of the Board who were among the original appointees to the Board" as to what the Board's "intent" was in adopting the Operating Procedures. Such after the fact explanations, however, are entitled to very little weight. A Board, like a legislature, speaks through the final action taken and no member, outside the Board, is empowered to

We hold that the September 4 presentation was inadequate under the Board's then existing rules and that therefore the September 18 request based upon it was defective.[138]

▮ Finally, we are unpersuaded that the district court abused its discretion in enjoining implementation of temporary rates until the Postal Service submitted a nondefective request and otherwise met the requirements of 39 U.S.C. § 3641. Contrary to the Postal Service's position, it is not the submission of *any* request but the submission of a *valid* request that activates the provisions of 39 U.S.C. § 3641. Otherwise the carefully constructed limitations of 39 U.S.C. § 3641(c) could be easily subverted.

Moreover, appellants' second argument—that the district court should have remanded the request and that 39 U.S.C. § 3628 proscribes enjoining temporary rates during such remand—is equally without merit. Remand was not mandated, and even if the court in its discretion had chosen that course, injunction pending resubmission would not have been statutorily foreclosed. Section 3628 applies to judicial review of decisions of the Governors, not to the decision of the Board here challenged. *Mail Advertising Corp. of America v. United States Postal Service,* 148 U.S.App.D.C. 158, 159, 459 F.2d 1182, 1183 (1972). Different considerations govern rates sought to be implemented temporarily prior to public hearing than govern the situation for which section 3628 was designed, *i. e.,* implementa-

---

speak with authority for the body. To accord such evidence substantial weight would encourage the transfer of the debate from the boardroom to the court. *See National School of Aeronautics v. United States,* 142 F.Supp. 933, 938, 135 Ct.Cl. 343 (1956).

**138.** It does not avail appellants to argue that the Operating Procedures, as interpreted above, might impose restrictions on the Board's conduct beyond those imposed by the Act. Since the Board promulgated the rules to govern its proceedings and since those proceedings have substantial public impact, the rules, until properly changed, must be scrupulously observed even if more binding than the Act. *See, e. g., United States v. Nixon,* 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974); *Vitarelli v. Seaton,* 359 U.S. 535, 79 S.Ct. 968, 3 L.Ed.2d 1012 (1959); *Service v. Dulles,* 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957); *United States ex rel. Accardi v. Shaughnessy,* 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954); *Borough of Lansdale v. Federal Power Commission,* 161 U.S.App.D.C. 185, 494 F.2d 1104 (1974); *Pacific Molasses Co. v. Federal Trade Commission,* 356 F.2d 386 (5th Cir. 1966).

Indeed, appellees argue with some persuasiveness that public policy and the Act itself, quite apart from any rules of practice adopted by the Board, mandate the Board's thorough involvement in the process of submitting rate requests and thus by their own force would require reversal of the Board's action in approving management's tentative proposal since that proposal included only the "general magnitude" of increases to be recommended to the Commission. They note that the Governors (who predominate on the Board), unlike the Commission, are "chosen to represent the public interest generally," 39 U.S.C. § 202(a), and that it is far from settled whether the

Postal Service must provide a hearing prior to implementation of temporary rates, *see Mail Advertising Corp. of America v. USPS,* 148 U.S.App.D.C. 158, 159, 459 F.2d 1182, 1183 (1972). They conclude from this that the Act therefore requires intimate Board involvement in the request submission process as the only practicable avenue for public input into the important function of setting temporary rates, basing this conclusion on three primary considerations: (1) that it is the Board "which exercises the power of the Postal Service to set temporary rates," *id.;* (2) that it is the request for new permanent rates which in practical and legal effect "sets" temporary rates, *see* 39 U.S.C. § 3641; and (3) that at least under present circumstances "temporary" rates are vitally significant since they have been in effect for a longer period of time than their supposedly "permanent" counterparts. Because the Postal Service's action was in violation of its governing rules of practice, however, we need not reach this issue and therefore express no final determination of it.

Finally, we are unconvinced that the November 7 Board action retroactively validated the otherwise defective September 18 submission. Whether or not an agency has power first to modify its rules to permit ratification of prior action, and then to apply its modified rules to action taken prior to the modification, *see e. g., United States ex rel. Accardi v. Shaughnessy, supra,* the Board at its November 7 meeting simply did not attempt any such retroactive modification. The Board quite plainly sought instead to portray its regulations as unchanged since their adoption and to characterize the September 4 presentation as in compliance therewith. Our holding rejects that characterization.

tion of permanent rate changes after full Commission proceedings. The district court's discretion to order injunctive relief is broad. Appellants have shown no clear abuse. We therefore affirm the district court order as it pertains to rates.

### B. *The State of Maine Case.*

In the final case before us the states, as appellant, contend that the Postal Service's action in implementing the temporary rate increases at issue here, regardless of compliance with procedural requirements, is substantively defective and that the district court erred in denying the requested injunctive relief. Since appellant's arguments parallel those which we already explored thoroughly in NAGCP,[139] we need not examine them here in detail. Briefly, appellant asserts that the Postal Service's request, upon which the temporary rates rest, once again evidences a too restrictive methodology for attribution of costs, thereby threatening illegal cross-subsidization; that the request also demonstrates continued employment of the inverse elasticity rule for allocating unattributed costs, thereby resulting in rates that unduly and unreasonably discriminate against the users of first class mail; and that the Postal Service's progress toward correction of these defects is too slow, if it exists at all. The district court denied appellant's request for injunctive relief, concluding that the ratemaking philosophy and methods adopted by the Commission were "simply not invalid as a matter of law" and that in its instant request the Postal Service applied those

standards fairly and diligently. We affirm.[140]

■ At the outset we note that our review is quite narrow. The district court has broad discretion to deny injunctive relief.[141] Unless appellant carries the heavy burden of demonstrating an abuse of discretion, the order must be affirmed. *See United States v. W. T. Grant Co.,* 345 U.S. 629, 633–34, 73 S.Ct. 894, 97 L.Ed. 1303 (1953).

Appellant correctly asserts that in this most recent request the Postal Service relies on ratemaking principles that differ very little from those which we criticized in *American Publishers* and which we today hold deficient in NAGCP. The instant rate request evidences that attributable costs are still defined as variable costs, and that allocation of unattributed costs is still dependent on demand factors.[142] At the same time, however, there is discernable progress toward improving the data base in an apparent effort to reconcile the Postal Service's concern for accurate measurement of causation with the Act's requirement of extended attribution. For instance, in order to develop data useful in attributing nonvariable costs incurred as a consequence of providing more than one but not all classes or types of service, the Postal Service has listed in its present request those fixed costs which benefit a restricted number of classes.[143]

Such programs, however, would not seem to remedy all the defects in the cost variability approach that we have analyzed in NAGCP. Nor does it answer our questions regarding the use of demand factors and, in

**139.** See discussion in Part IIB *supra.*

**140.** The fact that the Governors' order of July 7, 1976, terminated the temporary 13 cents rates as of July 18 does not moot this appeal. *See* note 21 *supra.*

**141.** On December 16, 1975, the district court issued an order denying appellant's motion for a preliminary injunction, 405 F.Supp. 851. In response to appellant's uncontested motion, the court, on December 18, treated the hearing on preliminary injunction as a consolidated hearing on the merits, rendered judgment for appellees, and dismissed appellant's suit.

**142.** In the instant rate request the Postal Service proposes to attribute approximately 55.6% and to assign approximately 44.4% of total costs which since the time of docket no. R74–1 have risen an additional $2 billion and now total approximately $14 billion. The district court seems quite correct in observing that "the pace of the Service's advances . . . resemble[s] that of the tortoise." *State of Maine et al. v. United States Postal Service,* 405 F.Supp. 551, at 562 (D.D.C., filed December 16, 1975), [hereafter cited as *State of Maine Opinion*].

**143.** *See id.* at 558, 561.

particular, reliance on the inverse elasticity rule in allocating unattributed costs. But these are issues to be faced squarely only on review of the Governors' order in response to the Commission's recommended decision in docket no. R76–1.

The special but limited role that the Postal Service is expected to play in the development of postal ratemaking methodology properly affects our review of challenges to the substantive merit of submitted rate requests. Unlike in *American Publishers* and the NAGCP cases where we reviewed a ratemaking methodology adopted after full hearings by a Commission which is charged with the duty, and imbued with the expertise, to establish postal ratemaking principles, here we are called upon to examine only the initial step in the process: a request submitted by the Postal Service, as approved by the Board, which understandably is based upon the methodology previously adopted by the Commission.

The Postal Service, after all, does not possess the expertise of the Commission and its request is prepared without the benefit of full hearings. Indeed, it is not required under the Act even to accompany its request with suggestions for the particular rate adjustments it deems suitable.[144] In short, we are wise at this point not to insist that the Postal Service innovate when it prepares a request to submit to the Commission. True, the Postal Service is in a "unique position" to formulate a "fundamental approach" to ratemaking,[145] but it is the Commission which, in the end, carries the primary obligation in ratemaking.

■ We conclude that the district court correctly held that the Postal Service's primary duty is to apply the Commission's ratemaking philosophy and methods fairly and diligently in preparing its rate re-

quest.[146] There is ample support in the record for the court's conclusion that the Service did not apply the Commission's principles incorrectly, arbitrarily, with bias, or with inadequate evidentiary support. In sum, we hold that appellant simply has not carried the heavy burden of demonstrating that the district court abused its discretion in refusing to grant appellant the injunctive relief it sought.

MacKINNON, Circuit Judge, concurring:

In the main I concur in the court's opinion. However, to prevent a possible misreading of the opinion's import with respect to Nos. 75–1856, 75–1857, the National Association of Greeting Card Publishers (NAGCP) case, I add a few words to clarify my views on certain aspects of the court's holding.

The court's analysis of section 3622(b), which "sets forth the cost and noncost considerations that the Commission must take into account in setting rates,"[1] could lead to a construction of the Act which to my mind overly emphasizes the cost allocation considerations of subsection (b)(3), so as to leave the remaining seven subsections, the so-called noncost factors, practically devoid of any real meaning or application.

The Per Curiam opinion overemphasizes the extent to which "reasonably assignable" costs, in addition to "attributable" costs, must be allocated in accordance with cost-of-service principles,[2] and further overemphasizes the extent to which the use of cost-of-service principles must be maximized throughout the process of postal rate-setting.[3] As a result it is only the "residuum" of costs which, according to the Per Curiam opinion, may "be used to give effect

---

144. 39 U.S.C. § 3622(a).

145. *American Publishers,* 157 U.S.App.D.C. at 408, 485 F.2d at 779.

146. *State of Maine Opinion,* at 558.

1. Per Curiam op. at —— of 186 U.S.App.D.C., at 580 of 569 F.2d.

2. *Id.* at —— of 186 U.S.App.D.C., at 586 of 569 F.2d & n. 59.

3. *Id.* at —— of 186 U.S.App.D.C., at 587 of 569 F.2d.

to the noncost factors expressly set forth in the Act." [4]

My concern is that the opinion not be read as requiring that practically all postal costs be attributed or assigned to some class of mail or type of service on the "direct and indirect" cost-of-service principles contained in subsection (b)(3), with the result that only an insignificant residuum of costs are assigned in accordance with the seven remaining statutory considerations. In its entirety the controlling section reads as follows:

(b) Upon receiving a request, the Commission shall make a recommended decision on the request for changes in rates or fees in each class of mail or type of service in accordance with the policies of this title and the following factors:

(1) the establishment and maintenance of a fair and equitable schedule;

(2) the value of the mail service actually provided each class or type of mail service to both the sender and the recipient, including but not limited to the collection, mode of transportation, and priority of delivery;

(3) the requirement that each class of mail or type of mail service bear the direct and indirect postal costs attributable to that class or type plus that portion of all other costs of the Postal Service reasonably assignable to such class or type;

(4) the effect of rate increases upon the general public, business mail users, and enterprises in the private sector of the economy engaged in the delivery of mail matter other than letters;

(5) the available alternative means of sending and receiving letters and other mail matter at reasonable costs;

(6) the degree of preparation of mail for delivery into the postal system performed by the mailer and its effect upon reducing costs to the Postal Service;

(7) simplicity of structure for the entire schedule and simple, identifiable relationships between the rates or fees charged the various classes of mail for postal services; and

(8) such other factors as the Commission deems appropriate.

39 U.S.C. § 3622(b), (84 Stat. 760). A mere reading of this section indicates that Congress intended to vest a substantial discretion in the Commission to recommend rates and fees that are "fair and equitable," that relate to the value of the postal service provided to users, and that consider competition, the effect upon the general public and business interests, the ease of handling certain mailable matter, the simplicity of the entire rate structure and such other factors as the Commission might deem appropriate. But if the Per Curiam opinion regarding section (b)(3) is to be construed as requiring that the attribution and assignment of practically all costs be on a strained cost-of-service basis, these discretionary factors may never have any substantial effect. How could the Commission recommend a rate for a particular class of mail that it found would be "fair and equitable" and would not adversely affect legitimate business interests if practically all the relevant costs were required to be attributed or assigned according to an almost absolute cost-of-service straight jacket? To make the seven discretionary standards meaningful Congress must have intended that there be some substantial volume of costs that are available for assignment.

The proper interpretation of section (b)(3) *in the scheme of the Act and the entire section 3622,* is at the heart of this problem. To repeat, that subsection provides:

(3) the requirement that each class of mail or type of mail service bear the direct and indirect postal costs attributable to that class or type plus that portion of all other costs of the Postal Service reasonably assignable to such class or type.

39 U.S.C. § 3622(b)(3). The first admonition of this subsection is that "each class . . . bear the direct and indirect *postal* costs attributable [thereto] . . ."

(emphasis added). This deals only with direct and indirect postal costs, and it is my view that the attack the opinion makes on "cost variability" as a method of "identifying [these] attributable costs" for direct and indirect expenditures (Per Curiam op. at —— of 186 U.S.App.D.C., at 586 of 569 F.2d) overlooks the degree of approval that Congress gave to such method when the House Committee stated in its Report that

the *attributable* provision establishes a floor for each class of mail equal to costs which consist of those costs, both direct and indirect, that *vary* over the short term in response to changes in volume of a particular class or, even though fixed rather than variable, are the consequence of providing the specific service involved.

H.R.Rep. No. 91–1363, 91st Cong., 2d Sess. 87 (1970) (emphasis added). I would allow the Commission somewhat more leeway in this aspect of their duties to conform to the congressional intent expressed in this quoted portion of the Committee Report.

Next, the Per Curiam opinion states that "A plain reading [of section 3622(b)(3)] also clearly suggests that the other costs of the Postal Service that are to be 'reasonably assigned' must also be allocated on *cost-of-service principles*. That is, after the process of extended attribution is complete, a portion of remaining costs are to be assigned to the various mail classes and postal services to the extent that it can reasonably be determined or estimated that certain classes of service may account for particular costs."

Per Curiam op. at —— of 186 U.S.App. D.C., at 586 of 569 F.2d (emphasis added). While the Per Curiam opinion recognizes that "Congress did not intend that *all* postal costs be either attributed or assigned," (Per Curiam op. at —— of 186 U.S.App.D.C., at 587 of 569 F.2d) a strict application of the principles it announces may reduce the amount of remaining costs subject to "reasonable assignment" to such a minor quantity that the application of the other seven standards will be deprived of any substantial impact.

With this background, the opinion attacks the "Commission's value-of-service approach to assignment of *unattributed* costs [asserting that it] . . . fails to comply with a *plain* requirement of the Act . . . [holding that] it is only residual costs which are subject to discretionary distribution to give effect to the noncost factors." (Per Curiam op. at ——–—— of 186 U.S.App. D.C., at 592 of 569 F.2d) (emphasis added).

This contention results from overemphasis on the single word "requirement" and on the forepart of subsection (b)(3), to the exclusion of the remainder of that subsection and of the other seven subsections and does not even correctly interpret subsection (b)(3). The second provision of subsection (b)(3) states

. . . plus that portion of all other costs of the Postal Service reasonably assignable to such class or type.

This clearly states that a "portion of all other costs of the Postal Service" may be "*reasonably assigned*," and nothing would be more reasonable than that such costs which were not "direct or *indirect* costs" of specific classes or types should be assigned according to the remaining seven subsections. Yet the Per Curiam decision expresses a strong opinion that such costs "*must* be allocated in accordance with cost-of-service principles." (Per Curiam op. at —— of 186 U.S.App.D.C., at 592 of 569 F.2d; *cf. id.* at —— of 186 U.S.App.D.C., at 586 of 569 F.2d). This is an impermissible intrusion into the plain language of the statute, and if subsection (b)(3) is given a "*plain* reading," it does not require the emphasis on "cost-of-service principles." The Per Curiam claims this result on the basis of the legislative history,[5] but such intent, if it exists, is very obscure, and legislative history is not properly reached because the statute plainly states that the postal rates recommendations "shall" also reflect the seven *other* factors enumerated in section 3622. In claiming reliance on legislative history the Per Curiam opinion tries to make too

---

5. Per Curiam op. at ——–—— of 186 U.S.App.D.C., at 588–589 of 569 F.2d n. 74.

much out of too little. The word "shall" at the forepart of section 3622 is just as mandatory as the word "requirement," in the same section, if not more so, since it applies to the entire section—but the Per Curiam opinion overemphasizes the latter and refuses to recognize the former.

The effect of the Per Curiam construction is to read subsection (b)(3) as though it provided:

" . . . [T]he Commission shall make a recommended decision . . . in accordance with . . . (3) the requirement that each class of mail or type of mail service bear the direct and indirect postal costs attributable to that class or type plus that portion of all other costs of the Postal Service reasonably assignable to such class or type *on cost-of-service principles.*"

(matter in italics supplied). If Congress had intended a "portion of all other costs of the Postal Service" to be assigned to particular classes or types on such cost-of-service principles it would have so stated in the Act. It did as much in the forepart of subsection (b)(3) when it provided that "each class . . . or type . . . bear the direct and indirect postal costs attributable [thereto]." And in providing for the attribution of all *"indirect* postal costs" as well as "direct . . . postal costs," Congress pretty well exhausted the postal costs that could properly be assigned on *cost-of-service* principles.

To construe subsection (b)(3), as the Per Curiam would, to overemphasize cost-of-service assignment, would practically require the Commission to lean over backwards in assigning as many other costs as possible on the same basis as the "direct and indirect postal costs." But Congress did not so enact. Instead, Congress provided only that a "portion of *all* other costs of the Postal Service [shall be] *reasonably* assignable to such class or type . . .." (emphasis added). That is an entirely different standard from one expressing a re-

quirement, or even a preference, that such costs "must" be assigned on a cost-of-service basis. "Reasonable" assignments and "must" assignments are partially self-contradictory. If the costs were substantial that were subject to this alleged cost-of-service basis of assignment, practically no costs whatsoever would be left to be "reasonably assigned" in accordance with the other seven standards in subsection (b), *i. e.,* (1) fairness and equity, (2) the value of the mail service, (3) the effect upon the general public and business users, (4) available alternative service, (5) cost reducing preparation of mail, (6) simplicity of rate structure and (7) other appropriate factors. And, as stated above, unless these seven factors are to be practically meaningless a substantial amount of costs must be available for reasonable assignment pursuant thereto. These seven factors embody major principles that substantially affect the public interest and vital segments of our economy, and they should be fully reflected in the rates.

Accordingly, it is my interpretation of subsection (b)(3) that while some of the other costs may be reasonably assigned on cost-of-service principles, Congress did not intend by the present statute that the amount of costs so assigned would be so large as to prevent the Commission from meaningfully incorporating the remaining standards into the postal rate structure.

In my opinion any interpretation of the Act which overemphasizes the role of the forepart of subsection (b)(3), so that the other seven factors are in effect read out of existence, must be rejected as inconsistent with this express requirement of the Act that the Commission's recommended rate decision "shall" be in accordance with the policies of the Act and all the policies stated in the ensuing eight subsections of section 3622. The Per Curiam opinion as I read it does not necessitate any such interpretation.[6] Therefore, with the exception of these views I concur in the court's opinion.

---

**6.** The court properly conceives its scope of review as quite limited and therefore expressly declines to "approv[e] in advance any particu-

lar approach" to postal ratemaking. Per Curiam op. at —— of 186 U.S.App.D.C., at 593 of 569 F.2d. Indeed, it may be that the ALJ

erred as much on the side of expansive use, or possibly misuse, of cost-of-service principles as the Commission erred on the side of overly restrictive use. That is, some of the costs "attributed" by the ALJ, as additions to those attributable costs identified by the Commission through the use of a cost variability approach, may not be acceptably assignable even as "best estimates" of the cost consequences of providing a particular class of mail or type of mail service. *See* Per Curiam op. at —— of 186 U.S.App.D.C., at 589–590 of 569 F.2d & n. 74. The point is that at this stage we can no more say with confidence, and the opinion expressly does not say, that 70.6% (the ALJ's figure) is acceptable as not too high a level of attribution/assignment than we can say that 52.5% (the Commission's figure) is "simply not enough" attribution. *See* Per Curiam op. at —— of 186 U.S.App.D.C., at 590 of 569 F.2d n. 81.